[This opinion has been published in *Ohio Official Reports* at 68 Ohio St.3d 305.]

MCFARLAND ET AL., APPELLANTS, *v*. BRUNO MACHINERY CORPORATION,

APPELLEE.

**[Cite as *McFarland v. Bruno Mach. Corp.*, 1994-Ohio-62.]**

*Torts—Negligence—Evidence—Evid.R. 407 not applicable to products liability cases premised upon strict liability in tort.*

Evid.R. 407, which prohibits the introduction of evidence of subsequent remedial measures to prove negligence or culpable conduct, is not applicable to products liability cases premised upon strict liability in tort.

(No. 92-2236—Submitted November 9, 1993—Decided February 16, 1994.)

APPEAL from the Court of Appeals for Warren County, No. CA91-11-089.

_____

{¶ 1} On December 14, 1988, appellant, Lester McFarland, was injured in the course of his employment for Amtex. Appellant worked as a maintenance mechanic for Amtex, a provider of carpet "blanks" for the auto industry. At the time of the accident, appellant was directed to correct a belt-tracking problem on a die cutting press designed and manufactured by appellee, Bruno Machinery Corporation ("Bruno"). Appellant positioned himself under the belt and, after adjusting the tracking problem, he noticed that the machine was making a "noise." Having diagnosed what he believed to be the source of the problem, appellant started to exit from underneath the machine. It was at this time that appellant's fingers on his right hand and then appellant's right arm were somehow "taken up in between the belt and the roller." As a result of his arm being entangled in the machinery, appellant sustained serious injuries.

{¶ 2} Following the accident, Amtex placed a guard on the machine. Further, Bruno (appellee) redesigned similar presses so as to prevent the kind of accident incurred by appellant.

**{¶ 3}** On September 25, 1989, appellant and his wife, Cynthia McFarland,[1] filed a complaint in the Court of Common Pleas of Warren County, naming appellee as the sole defendant. Appellants alleged that the machine manufactured by appellee was defectively designed. Appellants sought recovery against appellee based upon the theory of strict liability in tort. Additionally, Cynthia brought an action for loss of consortium.

**{¶ 4}** Prior to trial, appellee filed a motion *in limine*. Appellee requested the trial court to exclude all evidence regarding any design changes made by appellee to its die cutting presses subsequent to the time the machine which caused Lester's injuries was manufactured. Appellee also sought to preclude evidence that Amtex placed a guard on the machine in question after the incident. Appellee asserted that evidence of modification by either appellee or Amtex was irrelevant, prejudicial, and prohibited by Evid.R. 407.

**{¶ 5}** On September 18, 1991, the trial court granted appellee's motion *in limine*. Thereafter, the case proceeded to trial. At trial, counsel for appellants proffered evidence of remedial measures taken by Amtex and appellee. Ultimately, the jury returned a verdict in favor of appellee.

**{¶ 6}** Appellants appealed to the Court of Appeals for Warren County. The court of appeals affirmed the judgment of the trial court. The court of appeals determined that Evid.R. 407 was applicable to products liability cases based upon strict liability in tort and that the trial court properly excluded "evidence of the post-accident modifications that were made to appellee's press."

**{¶ 7}** The cause is now before this court pursuant to the allowance of a motion to certify the record.

————————————

*Cors & Bassett* and *Michael L. Gay*, for appellants.

————————————

1. Cynthia McFarland is also an appellant in this case.

*Porter, Wright, Morris & Arthur* and *Thomas H. Pyper*, for appellee.

*Frank E. Todaro*, urging reversal for *amicus curiae*, Ohio Academy of Trial Lawyers.

*Arter & Hadden*, *Irene C. Keyse-Walker*, *Mark F. McCarthy* and *Sonali Bustamante Wilson*, urging affirmance for *amicus curiae*, Ohio Association of Civil Trial Attorneys.

———————————

**DOUGLAS, J.**

{¶ 8} The primary issue in this case is whether the proscriptions of Evid.R. 407 apply to an action which alleges that a product is defective in design or formulation.[2] More specifically, we are asked to determine whether the rule applies to a products liability claim grounded upon the theory of strict liability in tort.

{¶ 9} Evid.R. 407, entitled "Subsequent Remedial Measures," provides:

"When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures *is not admissible to prove negligence or culpable conduct* in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." (Emphasis added.)

{¶ 10} Evid.R. 407 was designed to preclude admission of evidence of remedial measures taken after an event if the evidence is used to prove "negligence or culpable conduct." This rule, however, does not require exclusion of a remedial measure when offered for another purpose. For instance, evidence can be properly admitted if admitted for the purpose of proving ownership, control, feasibility of precautionary measures (if controverted),[3] or impeaching a witness.

———————————

2. See R.C. 2307.75, effective January 5, 1988. This statute sets forth when a product is defective in design or formulation.

3. In the case at bar, feasibility of precautionary measures was not controverted.

{¶ 11} The policy reasons for Evid.R. 407 have been stated as resting on two grounds. The first justification for the rule is that evidence of subsequent remedial measures is thought to have minimal or nonexistent probative value in *establishing negligence*. 1 Weissenberger, Ohio Evidence (Rev. 1988) 42, Section 407.3. Taking subsequent remedial action is not an admission of negligence. The rationale is that the injury may have been caused by reason of mere accident or through the plaintiff's contributory negligence. 1 Weissenberger, *supra*, at 42-43. See, also, Giannelli, Ohio Rules of Evidence Handbook (4 Ed. 1993) 90-91.

{¶ 12} The second explanation for excluding evidence under the rule is based on the social policy of encouraging repairs or corrections. Weissenberger, supra, at 43; and Giannelli, *supra*, at 91. See, also, Staff Note to Evid.R. 407. The argument behind this policy reason is that a defendant would be less likely to take subsequent remedial measures if the repairs or corrections could be used as evidence against the defendant at trial.

{¶ 13} Appellants contend that the trial court erred in not permitting evidence of remedial measures taken by Amtex and appellee. Appellants argue that they should have been permitted to introduce into evidence the fact that Amtex added a guard to the machine which had caused Lester's injuries and that appellee redesigned similar cutting presses to correct the hazard. Appellants further contend that in applying the proscriptions set forth in Evid.R. 407, both the trial court and the court of appeals committed error. Appellants urge that the rule is applicable solely to actions premised on negligence or involving culpable conduct and not to products liability claims predicated upon strict liability in tort.

**{¶ 14}** We agree that Evid.R. 407 has no application here. By its very terms, the rule excludes evidence of subsequent remedial measures only when "negligence" or "culpable conduct"[4] is alleged.

**{¶ 15}** In Ohio, the contrast between negligence and strict liability in products liability cases is distinct. See *Bowling v. Heil Co.* (1987), 31 Ohio St.3d 277, 31 OBR 559, 511 N.E.2d 373, and *Onderko v. Richmond Mfg. Co.* (1987), 31 Ohio St.3d 296, 31 OBR 576, 511 N.E.2d 388. In a products case based on strict liability, the focus is *solely* on the defective condition of the product and not, as in an action premised on negligence, on what the defendant knew or should have known of the defect which caused the injury. *Id.* at 301, 31 OBR at 579-580, 511 N.E.2d at 392. One court, contrasting strict liability with negligence, has correctly emphasized that "under the evolved doctrine of strict products liability, the *scienter* that is so vital to the negligence suit need not be shown. The shift so wrought is from fault to defect. * * *" *Caprara v. Chrysler Corp.* (1981), 52 N.Y.2d 114, 123, 436 N.Y.S.2d 251, 255, 417 N.E.2d 545, 549.

**{¶ 16}** Despite the clear wording of Evid.R. 407, appellee argues that the restrictions of the rule apply not only to actions based on negligence but to actions pursued under the theory of strict liability. Appellee posits that support for its position can be gleaned from the language utilized in R.C. 2307.75, and from the history of Evid.R. 407. Appellee points out that Evid.R. 407, as originally drafted, contained a provision that would have allowed evidence of subsequent remedial measures in strict liability actions. Appellee stresses that this provision was eventually deleted and, because this provision did not become part of the rule as adopted, the drafters intended that Evid.R. 407 apply to strict liability claims. We disagree.

---

4. Black's Law Dictionary (6 Ed.1990) 379, defines "culpable conduct" as "[b]lamable; censurable; criminal; *at fault*; involving the breach of a legal duty *or the commission of a fault*. That which is deserving of moral blame." (Emphasis added.)

**{¶ 17}** As indicated, strict liability, in the context of a products liability suit, denotes responsibility *without* regard to fault or culpability. We believe that if the drafters of Evid.R. 407 had intended to foreclose evidence of subsequent remedial measures with respect to strict liability cases, the rule, as adopted, would have contained an explicit provision evidencing such an intention.

**{¶ 18}** In finding that the trial court did not abuse its discretion in excluding evidence of the corrective measures taken by Amtex and appellee, the court of appeals relied, in part, on the stated policy reasons which underlie Evid.R. 407. These policy reasons are extensively set forth by both parties and *amici curiae* for the purpose of establishing their particular position on whether evidence of corrective measures is admissible. The arguments on both sides of the issue are extensive and persuasive.

**{¶ 19}** Post-occurrence modifications by a *manufacturer* have been found to be admissible in products liability cases grounded in strict liability by a number of courts. See, *e.g.*, *Caprara*, *supra*; *Caldwell v. Yamaha Motor Co., Ltd.* (Wyo. 1982), 648 P.2d 519; *Matsko v. Harley Davidson Motor Co., Inc.* (1984), 325 Pa.Super. 452, 473 A.2d 155; and *Jeep Corp. v. Murray* (1985), 101 Nev. 640, 708 P.2d 297. See, also, *R.W. Murray Co. v. Shatterproof Glass Corp.* (C.A.8, 1985), 758 F.2d 266; and *Herndon v. Seven Bar Flying Serv., Inc.* (C.A.10, 1983), 716 F.2d 1322, certiorari denied *sub nom. Piper Aircraft Corp. v. Seven Bar Flying Serv., Inc.* (1984), 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553. Additionally, some courts have concluded that subsequent remedial actions taken by an *employer* are admissible in a strict liability suit by the plaintiff against the manufacturer. Courts that have taken this view express the opinion that the evidence is relevant and policy considerations behind excluding evidence of subsequent remedial conduct is not applicable when liability is not asserted against the person taking the remedial measure. See, *e.g.*, *Magnante v. Pettibone-Wood Mfg. Co.* (1986), 183

Cal.App.3d 764, 228 Cal.Rptr. 420; and *Denolf v. Frank L. Jursik Co.* (1976), 395 Mich. 661, 238 N.W.2d 1.

**{¶ 20}** Most courts which have determined that subsequent remedial measures are admissible in a strict liability setting have relied upon the landmark opinion *Ault v. Internatl. Harvester Co.* (1974), 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148. In Ault, a passenger in a motor vehicle sued the manufacturer of the vehicle, alleging that he sustained injuries as a result of a defect in the design of the vehicle's gear box. The suit was grounded on strict liability, breach of warranty and negligence. At trial, evidence was admitted showing that after the accident the manufacturer changed the design of the gear box from aluminum to malleable iron. On appeal, the manufacturer asserted that evidence of a design change was barred by Cal.Evid. Code Section 1151.[5]

**{¶ 21}** The Supreme Court of California upheld the admissibility of the design change. The court, finding that Section 1151 did not apply to products liability cases based on strict liability, analyzed the policy considerations behind Section 1151 and remarked that:

"Courts and legislatures have frequently retained the exclusionary rule in negligence cases as a matter of 'public policy,' reasoning that the exclusion of such evidence may be necessary to avoid deterring individuals from making improvements or repairs after an accident has occurred. Section 1151 rests explicitly on this 'public policy' rationale. In explaining the purpose of the section, the draftsmen's comment states: 'The admission of evidence of subsequent repairs to *prove negligence* would substantially discourage persons from making repairs after the occurrence of an accident. * * * [Emphasis *sic*.]

---

5. Cal.Evid. Code Section 1151 is virtually identical to Evid.R. 407, except that Evid.R. 407 further provides that exclusion of evidence of subsequent remedial measures is not required when the evidence is offered for certain specific purposes.

"While the provisions of section 1151 may fulfill this anti-deterrent function in the typical negligence action, the provision plays no comparable role in the products liability field. Historically, the common law rule codified in section 1151 was developed with reference to the usual negligence action * * *; in such circumstances, it may be realistic to assume that a landowner or potential defendant might be deterred from making repairs if such repairs could be used against him in determining liability for the initial accident.

"When the context is transformed from a typical negligence setting to the modern products liability field, however, the 'public policy' assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule of section 1151 does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field." *Id.*, 13 Cal.3d at 119-120, 117 Cal.Rptr. at 815-816, 528 P.2d at 1151-1152.

{¶ 22} The reasoning articulated in *Ault* has been endorsed by numerous courts. See, *e.g.*, *Ford Motor Co. v. Fulkerson* (Ky. 1991), 812 S.W.2d 119, 125 (Policy considerations in negligence cases for excluding evidence of subsequent repairs have little or no application in dealing with a design change because "[t]he issue is not whether the seller has admitted misconduct—the seller is liable even though he has exercised all possible care"); *Sanderson v. Steve Snyder Enterprises,*

*Inc.* (1985), 196 Conn. 134, 146, 491 A.2d 389, 395 ("Given the strong economic influences on the conduct of a designer or manufacturer created by the existence of the strict liability theory, it is unlikely that any evidentiary use of subsequent remedial measures will discourage a designer or manufacturer from taking them"); and *Chart v. Gen. Motors Corp.* (1977), 80 Wis.2d 91, 102, 258 N.W.2d 680, 684 ("Economic realities will set the course and these realities are that the sooner remedial measures are taken, the less costly the defect will be to the manufacturer.").

**{¶ 23}** Similarly, Professor Weissenberger, an often-cited and well-recognized authority in this area, noted that:

"* * * Proponents of admitting evidence of subsequent remedial measures in products liability actions argue that it is absurd to believe that a manufacturer would forego repairs in a product's design or manufacture in order to avoid the admission at trial of evidence of its subsequent changes in the product. A rational business does not risk millions of dollars in liability that may result from further injuries in order to avoid creating evidence of subsequent remedial measures. This argument is strengthened when one considers the additional liability in punitive damages that may result from leaving a known dangerous condition unremedied." Weissenberger, *supra*, at 46, Section 407.5.

**{¶ 24}** Appellee suggests that *Ault*, and authorities in support of that opinion, are not applicable here because the decision in *Ault* was based on the fact that the defendant-manufacturer was a "mass producer." However, an argument similar to that posed by appellee has been soundly rejected. We agree with the conclusion reached by the Supreme Court of Wisconsin in *Friederichs v. Huebner* (1983), 110 Wis.2d 581, 329 N.W.2d 890, wherein the court concluded that the justification for imposing strict liability is applicable to both large and small manufacturers and that there is no sound reason for distinguishing between classes of manufacturers.

**{¶ 25}** There are some courts and authorities who have opposed admission of evidence of subsequent remedial actions in products liability suits. A number of these courts and authorities have declined to follow *Ault*, *supra*, and its progeny. Though different approaches have been espoused, many seem to find that there is no practical difference between strict liability and negligence in defective design cases and, therefore, the policy reasons behind excluding evidence of remedial measures is equally applicable to cases based on strict liability. See, *e.g.*, *Gauthier v. AMF, Inc.* (C.A.9, 1986), 788 F.2d 634; *Grenada Steel Industries, Inc. v. Alabama Oxygen Co., Inc.* (C.A.5, 1983), 695 F.2d 883.

**{¶ 26}** We have thoroughly reviewed the policy reasons upon which the rule is based, the case law from Ohio and sister jurisdictions and various treatises that discuss the question. After that review, we believe that the better-reasoned decisions are those that have followed *Ault*, *supra*. Given the distinct policy and goals for applying strict liability involving defective products, it is apparent that the reasons for excluding evidence of remedial acts which may apply to negligence cases do not extend to claims founded in strict liability. Thus, we hold that Evid.R. 407, which prohibits the introduction of evidence of subsequent remedial measures to prove negligence or culpable conduct, is not applicable to products liability cases premised upon strict liability in tort.

**{¶ 27}** Finally, we are aware of the contention by some that the introduction of evidence of subsequent remedial measures in a strict products liability case could be highly prejudicial to a defendant-manufacturer. While this contention may have some validity, an equally plausible assertion can be made on behalf of an injured plaintiff if such evidence is excluded. Without question, all evidence going to the heart of an issue is, to some extent, "prejudicial" to someone. That is the very essence of "evidence" and our adversary system. Let the jury decide!

**{¶ 28}** In the case at bar, the remedial changes implemented by Amtex and appellee directly concern whether the machine in question was defective. Such

evidence would have been probative of the issue as to whether the machine which caused the injury was safely designed. Proof that Amtex placed a guard on the machine and that appellee changed the design in order to prevent further injuries would be probative of the quality of the machine prior to the time the remedial acts were taken. The jury did not have the benefit of this evidence.

{¶ 29} Accordingly, based on the foregoing, the judgment of the court of appeals is reversed, and the cause is remanded to the trial court for further proceedings not inconsistent with this opinion.

*Judgment reversed*

*and cause remanded.*

MOYER, C.J., A.W. SWEENEY, RESNICK, F.E. SWEENEY AND PFEIFER, JJ., concur.

WRIGHT, J., dissents.

————————————

**WRIGHT, J., dissenting.**

{¶ 30} As pointed out by the majority, "[t]he arguments on both sides of the issue [before us] are extensive and persuasive." Likewise, as the majority indicates, there is respectable authority on both sides of this issue. The notion that evidence of remedial measures is admissible in a strict liability setting was vigorously argued in *Ault v. Internatl. Harvester Co.* (1974), 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148. Conversely, the view that there is no practical difference between strict liability and negligence cases has equal support. Hence, the policy reasons behind excluding evidence of remedial measures is equally applicable to both negligence cases and strict liability. See, *e.g.*, *Gauthier v. AMF, Inc.* (C.A.9, 1986), 788 F.2d 634, and *Grenada Steel Industries, Inc. v. Alabama Oxygen Co., Inc.* (C.A.5, 1983), 695 F.2d 883.

I

**{¶ 31}** Both the trial court and the court of appeals used Evid.R. 407 to find that remedial measures were barred as evidence. I would agree with the majority that Evid.R. 407 does not specifically deal with causes premised upon strict liability. However, as pointed out by the majority, the original draft of Evid.R. 407 contained a provision that would have *allowed* evidence of subsequent remedial measures in strict liability actions. This provision was deleted, presumably as superfluous, suggesting, of course, that the rule should apply to causes involving strict liability. The majority takes the view that if the drafters of Evid.R. 407 had intended to foreclose evidence of subsequent remedial measures in strict liability actions they would have said so. I find this portion of the majority opinion, at best, implausible.

**{¶ 32}** I am simply not persuaded that the rule against admitting subsequent remedial efforts should not be applied to a case tried under R.C. 2307.75. I say this because this view is consistent with the legislative history of the rule, its underlying policy, and the basis for this form of tort.

II

**{¶ 33}** The rationale underlying Evid.R. 407 is twofold. The first premise is that while evidence of subsequent remedial measures may be of some probative value, the potential prejudicial effect of the evidence as an admission of liability is devastating. This proposition addresses the very heart of the issue. How is such evidence relevant to showing that the product was defective at the time it left the manufacturer's control? And, indeed, does its relevance, if any, outweigh its prejudicial effect?

**{¶ 34}** Given that the determinative time frame for ascertaining whether a product is defective is the time at which the product left the manufacturer's control, R.C. 2307.75, what relevance attaches to subsequent design changes by either the manufacturer or a non-party employer? In this case, the relevant inquiry is whether

the absence of a guard on the machine presented a foreseeable risk and whether the press as designed was defective.

{¶ 35} Appellants suggest that proof appellee actually changed its design in a way to make the press safer is probative of the quality of the earlier design. In light of its underlying considerations of public policy, this is precisely the type of prejudice Evid.R. 407 was adopted to prevent. The use of subsequent design changes as proof of product defect clearly deters a manufacturer from implementing improvements. In a word, I believe that appellants have argued that this court should apply "hindsight liability." Unhappily, the majority has bought into this concept.

{¶ 36} Generally "post-event" design changes are not pertinent to whether a design posed a "foreseeable risk," and was, therefore, defective at the time the product left the manufacturer's control. Thus, little relevance attaches to "post-event" design changes unless, of course, the feasibility of a "post-event" design change is controverted.

{¶ 37} Evid.R. 407 does not and should not permit the use of subsequent design changes when an opposing party controverts the feasibility of the subsequent design changes. However, if feasibility is not controverted, *as in this case*, the fact that the design was actually incorporated into the product is of little relevance and is potentially very prejudicial.

{¶ 38} Appellants were permitted to produce evidence supporting its allegation that the press, due to the absence of a barrier guard, was defective in design. Any benefits from admission of the subsequent remedial measure taken by appellee would have been cumulative in character. In my view the trial court did not abuse its discretion in permitting "arguably" relevant evidence to be excluded. The majority's interpretation of R.C. 2307.75, a statute which interjects negligence concepts such as "foreseeable risk" into a product liability action, greatly enhances

the potential for prejudice, and in the process outweighs the relevance of cumulative evidence.

III

**{¶ 39}** The second premise underlying Evid.R. 407 is that an admission of evidence of subsequent remedial measures may deter a manufacturer from making design changes because of fear of a future lawsuit. Appellants, of course, contend that in strict liability claims the fact that the remedial measure will be perceived as an admission of fault is irrelevant because in strict tort liability the focus is on the product, not on the reasonableness of the manufacturer's conduct.

**{¶ 40}** The problem with this argument is that the distinction between manufacturer and product is hypertechnical. The suit is against the manufacturer, not the product. It is the fact that the evidence may be used against it, and that the manufacturer will ultimately be liable, that will inhibit the manufacturer from implementing subsequent remedial measures. I also note that the distinction between manufacturer's fault and product defect has become even more hypertechnical under R.C. 2307.75. As stated above, R.C. 2307.75 requires an examination of the foreseeability of the risk at the time the product left the manufacturer's control. The distinction between negligence and strict liability has thus been attenuated by R.C. 2307.75 and its interpretation to such an extent that appellee is reduced to arguing that strict product liability fits into the "culpable conduct" limitation of Evid.R. 407. The fact that in some cases economics will drive a manufacturer to take subsequent remedial measures regardless of their admissibility obviously does not diminish the policy of encouraging manufacturers to take such action. I suggest that there simply is no appreciable distinction between negligence and strict liability cases in promoting the policy of encouraging remedial action. This was surely the view at the dawn of the concept of strict liability. See Prosser, The Assault Upon the Citadel (1960), 69 Yale L.J. 1099, 1122. It remained the view when this socially useful tort remedy came into full flower. See Prosser,

The Fall of the Citadel (1966), 50 Minn.L.Rev. 791, 816.  I see no good reason for a change today.

{¶ 41} Accordingly, I must respectfully dissent.

_____