JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff Frederick R. Nance, administrator of the Estate of Kevin L. Carruthers, appeals from the order of the trial court that denied his judgment notwithstanding the verdict and for a new trial in plaintiff's action for medical malpractice against defendant University Emergency Specialists ("UES"), Inc. For the reasons set forth below, we affirm.
 {¶ 2} On March 5, 2004, plaintiff filed this medical malpractice action against defendant and University Hospitals of Cleveland.[1] As is relevant to UES, plaintiff set forth claims for medical negligence, wrongful death, survivorship, and punitive damages in connection with the death of eighteen-year-old Kevin Carruthers on August 26, 2003, during treatment for asthma. The matter proceeded to a jury trial on March 24, 2008.
 {¶ 3} The evidence indicated that the decedent had asthma from birth. By age six, he visited the hospital six times for asthma-related issues. In 2002, Kevin struggled with his asthma and had five visits to the hospital that year. In one such visit, he was intubated for breathing via a ventilator. In the week before his death, he also went to the hospital for treatment for asthma and refilled a prescription for an inhaler.
 {¶ 4} With regard to the events of August 25, 2003, Kevin worked that day delivering furniture for Aaron's Furniture. He awoke his father at around 4:00 a.m., *Page 4 
complaining that he was having an asthma attack and that his inhaler was low. His father drove him to University Hospitals.
 {¶ 5} The decedent arrived at the emergency department at 4:45 a.m., complaining of shortness of breath, history of asthma, and that his inhaler was not working. He indicated that he had not taken his medicine. At approximately 5:00 a.m., a nurse administered albuterol to him through a nebulizer. At 5:10 a.m., his oxygen saturation level was at 100 percent, but his breathing was labored, and he was still in respiratory distress. Dr. Darrell Gill of UES saw him at this time. The albuterol treatment was continued, and arterial blood gasses were checked.
 {¶ 6} By 5:18 a.m, an aerosol was administered, but it was noted that the patient was tiring out. Nine minutes later, he began to scream and hit the staff. At 5:27 a.m., he was given a sedative.
 {¶ 7} At 5:29 a.m., Dr. Gill administered another dose of the sedative to the decedent and administered oxygen to him via a bag valve mask, as a precursor to intubation. This brought his pulse oxygen level up to 99 percent. At 5:36 a.m., Dr. Gill attempted to intubate the patient. According to one of the nurses, a paramedic assisted in this endeavor.
 {¶ 8} By 5:43 a.m., he was not successfully intubated. His vital signs began to fall, and the team oxygenated him via the bag valve mask. His pulse oxygen level was 89 percent at this time. Four minutes later, it reached 100 per cent. At 5:50 a.m., he is noted to be intubated with a 7.5 endotracheal tube. Equal breath sounds *Page 5 
were detected, the CO2 detector noted that he was exhaling, and his pulse oxygen level was 99 percent.
 {¶ 9} At 5:54 a.m., the team attempted to insert a nasogastric tube. The patient's pulse oxygen level then fell, and the team removed the endotracheal tube. They employed the bag valve mask and increased his pulse oxygen level to 99 percent.
 {¶ 10} At 5:59 a.m., there was another attempt to intubate the decedent. At this time, bilateral breath sounds were observed, he was noted to be emitting CO2, and his pulse oxygen level increased to 98 percent, all of which indicated a successful insertion of the endotracheal tube. At 6:01a.m., a portable chest X-ray was taken. It is undisputed that the dismissed defendant University Hospital issued a radiologist report to Dr. Gill that indicated that the tube was in the airway just above the carina in the trachea. Air was detected in the stomach, but the evidence demonstrated that this was to be expected in light of the use of the bag valve mask.
 {¶ 11} Later, the evidence at trial indicated that the University Hospital radiology report was erroneous in that the portable X-ray cannot definitively determine that the tube is in the airway since the airway overlies the esophagus.
 {¶ 12} By 6:05 a.m., however, the decedent's vital signs dropped, and the team began resuscitation efforts. At 6:29 a.m., Kevin was pronounced dead.
 {¶ 13} According to Dr. Gill, he followed the proper procedure for intubation, i.e., he visualized the vocal cords, inserted the tube through the cords, hooked it up to the CO2 monitor, and observed a change in color, signaling exhalation. After a *Page 6 
period of time, however, the decedent's vital signs dropped, and ventilation was maintained through the bag valve mask.
 {¶ 14} Kevin Carruthers, Sr. testified that his son's stomach was protruding, and there was a tube sticking out of his mouth. Mrs. Carruthers testified in deposition, however, that she saw the decedent following the failed resuscitation and no tube was in his mouth at this time. It is undisputed that the tube was to remain in place because it was a coroner's case.
 {¶ 15} Coroner Frank Miller determined that the decedent died as a result of asthma.[2] He noted that the endotracheal tube had actually been placed two or three inches into his esophagus and not in his trachea. Although the hospital had indicated probable pulmonary embolism as the cause of death, the coroner ruled this out. In addition, the coroner noted that there were no mucus plugs in the bronchi and that the decedent had chronic inflammation as part of his disease, with mild changes of inflammation in the lungs.
 {¶ 16} On cross-examination, the coroner acknowledged that the decedent's lungs appeared hyperinflated and there was accumulated debris, mucus and inflammatory cells in an airway. Another airway was surrounded by pronounced inflammation.
 {¶ 17} Dr. Edward Panacek, a professor of emergency medicine and former physician with University Hospitals, testified that in his opinion, defendant UES did *Page 7 
not meet the standard of care in this matter. According to this witness, the airway management was substandard. Specifically, defendant should have planned on intubating the decedent by 5:10 a.m., when he remained in respiratory distress with labored breathing following nebulizer treatments. In addition, the arterial blood gas results were abnormal, but Dr. Panacek conceded that it is unclear when these results were conveyed to Dr. Gill. Dr. Panacek also testified that when the decedent appears to have tired out at 5:18 p.m., intubation should have been initiated. Likewise, at 5:27 a.m., when the decedent became combative, this was a red flag to begin intubation. Although Dr. Gill administered Versed and Succinylchloline from 5:27 a.m. to 5:36 a.m., this did not meet the guidelines for rapid intubation. In addition, Dr. Panacek did not believe that there was a successful intubation at 5:36 a.m., because his condition worsened thereafter.
 {¶ 18} He also believed that the 5:50 a.m. intubation was not successful. Although the CO2 detector indicated either a change or the emission of CO2, this was only secondary information. Other tests at this time, such as the pulse oxygenation, showed a declining level of 82. Dr. Panacek stated that he believed that the third intubation attempt of 5:59 a.m. was unsuccessful in light of the decedent's deterioration thereafter.
 {¶ 19} Dr. Panacek stated that the multiple intubation attempts do not necessarily violate the standard of care, as the attempts must be considered in light of the prevailing conditions. In this matter, according to Dr. Panacek, following the unsuccessful second attempt, a different technique should have been employed. *Page 8 
Following the third failed attempt, Dr. Gill should have called for assistance from someone else or made an incision directly in the neck to insert the tube directly in the upper trachea.
 {¶ 20} With regard to the x-ray which purported to confirm proper placement of the tube, Dr. Panacek testified that portable x-rays cannot definitively say whether the tube is in the esophagus or trachea, and the air in the stomach should have indicated improper placement.
 {¶ 21} Finally, Dr. Panacek testified that, had the standard of care been met in this matter, the decedent would have survived, just as he had survived his previous asthma attacks. Dr. Panacek admitted on cross-examination that pulse oximetry is routinely used within the standard of care.
 {¶ 22} Dr. Gayle Galan, chairman of emergency medicine at Southwest General Hospital and a professor at Ohio University, testified as an expert for the defense. According to Dr. Galan, the decedent had three near-fatal asthma attacks prior to arriving at UES, and had a chronic lung condition. This condition caused inflammation and scarring and decreased his chances for responding to treatment. Further, the 5:50 a.m. intubation appeared to be successful but was displaced after the team attempted to insert the nasogastric tube. Ventilation was then properly maintained through the bag valve mask.
 {¶ 23} With regard to the 5:59 a.m. intubation, Dr. Galan testified, to a reasonable degree of medical certainty, that in her opinion, this intubation appears to have been successful since Dr. Gill employed the proper procedure. Visualizing the *Page 9 
vocal cords and inserting the tube between the cords, the team heard bilateral breath sounds, the CO2 meter signaled that the decedent was exhaling, the pulse oximeter signaled 98 percent saturation, and the X-ray confirmed placement.
 {¶ 24} Finally, Dr. Galan testified that to a reasonable degree of medical certainty, the tube, though found in the esophagus at the time of autopsy, was actually properly placed in the airway. According to Dr. Galan, the tube was displaced due to movement of the decedent's head.
 {¶ 25} The matter was submitted to the jury. The jurors found in favor of UES, and in special interrogatories, determined that Dr. Gill was not negligent. Plaintiff filed a motion for a new trial and judgment notwithstanding the verdict. The trial court denied the motions, and plaintiff now appeals and assigns two errors for our review.
 {¶ 26} For his first assignment of error, plaintiff asserts that the trial court erred in denying the motion for a new trial and for judgment notwithstanding the verdict because the verdict is based on a finding of proper intubation but the established physical fact demonstrates that the tube was found in the esophagus.
 {¶ 27} The "physical facts rule" as explained by the Ohio Supreme Court in McDonald v. Ford Motor Co. (1975), 42 Ohio St.2d 8,326 N.E.2d 252, is as follows:
 {¶ 28} "Ordinarily, where testimony conflicts, the credibility of witnesses is a matter for the jury. However, in certain instances testimony cannot be considered credible. * * * *Page 10 
 {¶ 29} "The name generally given to this concept is the `physical facts rule.' The rule has been variously stated: E.g., `the testimony of a witness which is opposed to the laws of nature, or which is clearly in conflict with principles established by the laws of science, is of no probative value and a jury is not permitted to rest its verdict thereon.' [citation omitted].
 {¶ 30} "The testimony of a witness which is positively contradicted by the physical facts cannot be given probative value by the court.'Lovas v. General Motors Corp. (1954), 212 F.2d 805, 808 (6th Cir. 1954)." Id.
 {¶ 31} Thus, under the physical facts rule, where "`[t]he palpable untruthfulness' of [a party's] testimony" is evident because the testimony is "obviously inconsistent with, contradicted by, undisputed physical facts," judgment is warranted notwithstanding testimony offered by that party. Id., quoting Duley v. Burnett (1938), 22 Tenn.App. 522,124 S.W.2d 294.
 {¶ 32} Civ. R. 50 sets forth the standards for granting a motion for a directed verdict and a motion for judgment notwithstanding the verdict:
 {¶ 33} "When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue." *Page 11 
 {¶ 34} In deciding a motion for a directed verdict or a motion for judgment notwithstanding the verdict, the trial court must construe the evidence most strongly in favor of the nonmoving party. Nickell v.Gonzalez (1985), 17 Ohio St.3d 136, 477 N.E.2d 1145.
 {¶ 35} We employ a de novo standard of review in evaluating the grant or denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict. See Grau v. Kleinschmidt (1987),31 Ohio St.3d 84, 90, 509 N.E.2d 399.
 {¶ 36} In this matter, although the endotracheal tube was found in the esophagus at the time of autopsy, we cannot say that the defense verdict violates the "physical facts rule" as the testimony of Dr. Galan established that the location of the tube could have changed following the movement of the decedent's head. In addition, Dr. Robbin admitted that "[a]ny movement of the patient's head can change the position of the tube." Thus, based upon the evidence at trial, we cannot say that the physical facts established at the time of autopsy were identical to those existing at the time of the third intubation. Indeed, the evidence further indicated that, following this intubation, bilateral breath sounds were observed, the decedent was noted to be emitting CO2, and his pulse oxygen level increased to 98 percent, all of which signified a successful insertion of the endotracheal tube. Thus, reviewing the matter de novo, we cannot say that the trial court erred in denying the motion for judgment notwithstanding the verdict.
 {¶ 37} As to the motion for a new trial, pursuant to Civ. R. 59(A), "[a] new trial may be granted * * * on all or part of the issues upon any of the following grounds: * * *Page 12 
* (6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case[.]"
 {¶ 38} We review a trial court's decision to grant or deny a new trial for an abuse of discretion. Kallergis v. Quality Mold, Inc., Summit App. Nos. 23651 23736, 2007-Ohio-6047. Abuse of discretion requires more than simply an error in judgment; it implies unreasonable, arbitrary, or unconscionable conduct by the court. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 39} We find no abuse of discretion in this matter in light of the evidence presented which indicated that, following the third intubation, bilateral breath sounds were observed, Kevin was noted to be emitting CO2, and his pulse oxygen level increased to 98 percent, all of which signified a successful insertion of the endotracheal tube. According to Dr. Galan, the successfully placed tube could have moved due to movement of the decedent's head prior to autopsy, so there was evidence from which the jury could conclude that the physical facts as determined at the time of autopsy were not the same as those existing following the third intubation. We therefore find that the trial court did not abuse its discretion in denying the motion for a new trial. Accord Hughes v.University of Cincinnati Hosp. (Sept. 7, 2000), Franklin App. No. 99AP-1146.
 {¶ 40} In Hughes, the plaintiff brought a malpractice action against defendants after learning that an endotracheal tube had been inserted into the decedent's esophagus. In affirming a defense verdict, the court noted that the evidence at trial established that the standard of care for intubation requires that a physician have a *Page 13 
"reasonable degree of clinical competence that the tube is correctly placed within the trachea." The evidence further demonstrated that the procedures used by a physician to establish that an endotracheal tube is properly placed included listening for breath sounds over the chest, and the upper part of the stomach. There was evidence to establish that the defendant met the standard of care in confirming proper tube placement.
 {¶ 41} In accordance with all of the foregoing, the first assignment of error is overruled.
 {¶ 42} For his second assignment of error, plaintiff asserts that the trial court erred in excluding evidence that Dr. Gill's privileges were restricted as a result of the decedent's death. Plaintiff further maintains that Evid. R. 407, barring evidence of subsequent remedial measures, has no application where the measure is performed by a third party.
 {¶ 43} Evid. R. 407, entitled "Subsequent Remedial Measures," provides:
 {¶ 44} "When, after an injury or harm allegedly caused by an event, measures are taken which, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." *Page 14 
 {¶ 45} One justification for the rule is that evidence of subsequent remedial measures is thought to have minimal or nonexistent probative value in establishing negligence, as taking subsequent remedial action is not an admission of negligence. McFarland v. Bruno Mach. Corp.,68 Ohio St.3d 305, 1994-Ohio-62,626 N.E.2d 659. A second justification is the social policy of encouraging repairs or corrections. Id
 {¶ 46} We review rulings made pursuant to this rule for an abuse of discretion. Id.
 {¶ 47} Plaintiff cites to Schneider v. First Natl. Supermarkets (Dec. 5, 1996), Cuyahoga App. No. 70226, for the proposition that a third party's remedial measures do not implicate the policies behind Evid. R. 407, so exclusion is not justified in this situation. As noted inSchneider, supra, however, such evidence is still subject to exclusion under Evid. R. 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See White v. Ohio Dept. ofTransp. (1990), 56 Ohio St.3d 39, 46, 564 N.E.2d 462.
 {¶ 48} In this matter, plaintiff asserts that third party, University Hospitals, restricted Dr. Gill's privileges after this incident. In light of the great interconnection between UES and University Hospitals, this matter does not present the ideal "third party" case. In any event, we agree with the trial court that the measure, having Dr. Gill spend time in the anesthesia department on airway management, had little *Page 15 
probative value and presented a great risk of unfair prejudice, confusion of the issues, and misleading the jury.
 {¶ 49} We find no abuse of discretion.
 {¶ 50} This assignment of error is overruled.
Affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MELODY J. STEWART, P.J., and LARRY A. JONES, J., CONCUR
[1] Plaintiff subsequently dismissed his claims against University Hospitals with prejudice.
[2] As a result the esophageal intubation was not listed as a contributing condition. *Page 1