[This opinion has been published in *Ohio Official Reports* at 80 Ohio St.3d 62.]

MINTON, EXR., APPELLANT, *v*. HONDA OF AMERICA MANUFACTURING, INC. ET AL., APPELLEES.

[Cite as *Minton v. Honda of Am. Mfg., Inc*., 1997-Ohio-356.]

*Torts—State tort claim based upon manufacturer's failure to equip automobiles with air bags is not preempted by former Section 1381 et seq., Title 15, U.S.Code and regulations promulgated thereunder.*

A state tort claim based upon a manufacturer's failure to equip its automobiles with air bags is not expressly or impliedly preempted by former Section 1381 *et seq*., Title 15, U.S.Code and regulations promulgated thereunder.

(Nos. 96-2006 and 96-2025—Submitted June 10, 1997—Decided October 15, 1997.)

APPEAL from and CERTIFIED by the Court of Appeals for Montgomery County, No. 14949.

————————

{¶ 1} On March 14, 1991, Jeffery L. Minton was driving his 1990 Honda Accord on Hardin Road in Washington Township, Miami County, Ohio. A vehicle traveling in the opposite direction crossed the center of the road and collided virtually head-on with Minton's automobile. Although Minton was wearing both an automatic shoulder belt and a manual seat belt at the time of the accident, he sustained fatal head injuries.

{¶ 2} On February 11, 1993, appellant, Mary Ann Minton, as executor[1] of the estate of Jeffery Minton, filed a survivorship cause of action on behalf of the

———

1. We recognize that the historical and common designation of a female testamentary personal representative has been "executrix." In our continuing efforts to make our language gender neutral, we now use the term "executor" in all cases involving a testamentary disposition wherein a designated person is named and serves as a fiduciary.

estate of Jeffery and a wrongful death cause of action on behalf of (1) herself as surviving spouse, (2) Travis Minton, the eleven-year-old son of Jeffery and Mary Ann, (3) the parents of Jeffery, and (4) the other next of kin of Jeffery. The cause of action sounded in products liability and was filed against appellees Honda of America Manufacturing, Inc. and others (collectively referred to as "Honda"). In the complaint, appellant alleged, *inter alia*, that the 1990 Accord driven by Jeffery and manufactured by Honda was defectively designed. Appellant's complaint was based in part on the fact that the driver's-side restraint system failed to properly protect Jeffery during the accident.

**{¶ 3}** Prior to trial, Honda filed a motion *in limine*. Honda sought to preclude evidence by appellant that the 1990 Accord did not contain an air bag. In the motion, Honda asserted, among other things, that any claim pertaining to the absence of an air bag was preempted by federal law.

**{¶ 4}** The trial court granted Honda's motion *in limine*. At trial, appellant attempted to demonstrate that the shoulder belt restraint system in the 1990 Accord was defectively designed. Appellant was allowed to introduce evidence of the belt geometry in a 1987 Honda Civic. However, appellant was not allowed to introduce evidence of subsequent changes made by Honda to its Accords and incorporated in 1992 models. According to appellant, 1992 Accords were safer in front-end collisions because the shoulder belt mechanisms in 1992 models had been changed and because 1992 Accords contained air bags.

**{¶ 5}** During trial, the following colloquy occurred between the attorneys for the parties and the trial court with respect to Honda's motion *in limine* and the evidence proffered by appellant:

"MR. SHEA [counsel for appellant]: As Your Honor remembers, we have a proffer. There was a motion in limine filed with the Court prior to trial concerning several subjects, one of which was the subject of air bags. The Plaintiff, in its brief to the Court, outlined the law. At this time, we just want to make our proffer of

2

evidence. The Plaintiff has requested that the testimony be allowed, not only because preemption to the air bag as a defect, there are states and there is current law that says there's not preemption, but also for other purposes. The fact that it is an alternative design is not preemptive. Under the risk benefit, alternative designs are permitted, and the fact that the alternative design is one of those which should be considered by the Court, we believe that our exhibits should have been admitted.

"Additionally, the fact of remedial repair, and this does not only go to the air bags, it goes to the location of the B pillar belt geometry which are shown in Plaintiff's exhibits that have been excluded, that the Defendant, in 1992, and in subsequent years, located the belt geometry point in the proper location, or at least in a much preferred location than it was in the 1990 Honda vehicle which was the identical platform of the 1992.

"The Plaintiff requested that it be permitted to show simply that location, even if the air bag information were removed because of other concerns that the Court had, which we were willing to do.

"The same is true of the exhibits which deal with brochures depicting the B pillar placement point, as well as the air bag system, were relevant under the claims of the parties.

"Finally, the B pillar placement point as remedy of a defect, we believe that the evidence should have been allowed to show that Honda cured the bad, the poor placement of the B pillar placement for the belt geometry, and that the exhibits go to that point as well to show evidence of cure for the B pillar placement.

"* * *

"MR. BODE [counsel for Honda]: Your Honor, we would stand on the position we took in our initial brief in the motion in limine that the issue of an air bag is preempted by Federal law, and that any attempt to compare the 1990 Honda Accord with a vehicle that is equipped with, as part of its occupant restraint system, an air bag is preempted and a comparison that is not allowed by the law.

"* * *

"THE COURT: Very well. The Court has noted both the memoranda submitted by Counsel and does not alter its position from its previously announced position that the exhibits and the subject matter described will not be included. The exhibits, as listed by Counsel for Plaintiff, shall be contained as part of the proffer."

{¶ 6} The jury returned a verdict in favor of Honda. Appellant then appealed to the Court of Appeals for Montgomery County. The court of appeals affirmed the judgment of the trial court.

{¶ 7} The court noted initially that the change in design of the shoulder belt restraint system in 1992 Accords was a subsequent remedial measure taken by Honda. In this regard, the court, citing *McFarland v. Bruno Mach. Corp*. (1994), 68 Ohio St.3d 305, 626 N.E.2d 659, agreed with appellant that "evidence of subsequent remedial measures is admissible to prove design defects in strict liability cases." Nevertheless, the court concluded that the trial court properly excluded any evidence of the occupant restraint system in 1992 Accords. Specifically, the court held:

"[We] agree with Honda that the evidence is inadmissible in this instance because of the nature of the restraint systems in issue. Honda utilized an automatic seatbelt as its passive restraint system in the 1990 Accord. However, in the 1992 Accord, Honda used an airbag as its passive restraint system. Therefore, pursuant to the relevant federal legislation, Honda was allowed to change the 1992 shoulder belt restrain[t] to a manual, rather than a passive, restraint system. In other words, the later model year included a shoulder belt restraint system that the driver had to pull down and fasten, while the 1990 Accord featured a shoulder belt restraint system that automatically engaged when the door was closed. Thus, the shoulder belt systems (manual versus passive) of the two model years are not truly comparable.

"At trial, Minton offered to redact the photographs [showing the belt design change] to exclude any reference to the airbag system in the 1992 Honda. In our opinion, however, the difference in the two systems would necessarily precipitate the introduction of evidence regarding the change from a passive shoulder belt to a manually operated shoulder belt, and thus would require the introduction of evidence regarding the reason for the design change (i.e., the conversion to airbag technology * * *). Since we have concluded later in this opinion that the failure to install airbags is an issue preempted by federal law, we find that evidence of the subsequent remedial change in the shoulder belt restraint system is inadmissible because it would inevitably lead to the jury's becoming aware of the fact that Honda switched to an airbag passive restraint system, thereby injecting an issue—the failure to have used the airbag system in the 1990 model Accord—that was preempted by federal law."

{¶ 8} The court of appeals ultimately concluded that appellant's design defect claim based on the failure to install a driver's-side air bag was not expressly preempted by former Section 1381 *et seq*., Title 15, U.S.Code (now found at Section 30101 *et seq*., Title 49, U.S.Code) and relevant regulations promulgated thereunder. Rather, the court held that appellant's "no air bag" claim was impliedly preempted by federal law. Thereafter, the court, finding its judgment to be in conflict with the judgment of the Eleventh Appellate District in *Nelson v. Ford Motor Co*. (1995), 108 Ohio App.3d 158, 670 N.E.2d 307, entered an order certifying a conflict, and we determined that a conflict existed (case No. 96-2025). *Minton v. Honda of Am. Mfg., Inc.* (1996), 77 Ohio St.3d 1421, 670 N.E.2d 1007.[2] The cause is also before this court upon the allowance of a discretionary appeal (case No. 96-2006). The two appeals have been consolidated.

---

2. On appeal to this court, we denied jurisdiction in *Nelson v. Ford Motor Co.* (1995), 108 Ohio App.3d 158, 670 N.E.2d 307. See (1996), 76 Ohio St.3d 1404, 666 N.E.2d 565.

*Shea & Associates*, *Joseph W. Shea III*, *Shirley A. Coffey* and *Andrea T. Rosenthal*, for appellant.

*Reminger & Reminger Co., L.P.A.*, and *Hugh J. Bode*; and *Eric A. Portuguese*, for appellees.

*Nurenberg, Plevin, Heller & McCarthy Co., L.P.A.*, *Marshall I. Nurenberg*, *Richard C. Alkire* and *Kathleen J. St. John*, urging reversal for *amicus curiae,* Ohio Academy of Trial Lawyers.

*The Landskroner Law Firm, Ltd.*, *Jack Landskroner*, *Lawrence Landskroner* and *Arthur Bryant*, urging reversal for *amici curiae*, Trial Lawyers for Public Justice, Public Citizen, Center for Auto Safety, and Consumers for Auto Reliability and Safety.

*Clark, Perdue, Roberts & Scott*, *Robert W. Kerpsack* and *Dale K. Perdue*; *Coben & Associates* and *Larry E. Coben*, urging reversal for *amicus curiae,* Raymond Richard Nelson.

*Thompson, Hine & Flory*, *Elizabeth B. Wright* and *James W. Wiggin III*, urging affirmance for *amicus curiae,* Ford Motor Company.

*Mayer, Brown & Platt*, *Kenneth S. Geller*, *Erika Z. Jones*, *John J. Sullivan* and *Lily Fu Swenson*, urging affirmance for *amicus curiae,* Product Liability Advisory Council, Inc.

———————————

6

**DOUGLAS, J.**

{¶ 9} The central question presented for our consideration is whether the court of appeals erred in concluding that the National Traffic and Motor Vehicle Safety Act, former Section 1381 *et seq*., Title 15, U.S.Code ("Safety Act" or "Act"),[3] precluded appellant from presenting evidence at trial that the 1990 Accord was defective for failure by Honda to install a driver's-side air bag in the vehicle.[4] For the reasons that follow, we find that appellant should have been allowed to present evidence to the jury that the 1990 Accord did not have an air bag and that Honda did install air bags in its 1992 Accords. Accordingly, we reverse the judgment of the court of appeals.

I

{¶ 10} Based on the belief that "the soaring rate of death and debilitation on the Nation's highways is not inexorable," S.Rep. No. 1301, 89th Cong., 2d Sess. 12, reprinted in 1966 U.S.Code Cong. & Adm.News 2709, Congress, in 1966, enacted the Safety Act "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." Former Section 1381, Title 15, U.S.Code. See, also, Miller, Deflating the Airbag Pre-emption Controversy (1988), 37 Emory L.J. 897. The Act directed the Secretary of Transportation to "establish * * * appropriate Federal motor vehicle safety standards." Former Section 1392(a), Title 15.[5] "Motor vehicle safety standards" is defined as "minimum standard[s] for

---

3. We are mindful that in 1994, the Safety Act was revised and recodified in Section 30101 *et seq*., Title 49, U.S.Code "without substantive change." See Pub.L. 103-272, Section 1(a), 108 Stat. 745 (1994).

4. The question that has been certified for our review and final determination is whether "a 'no air bag' claim brought under Ohio's tort law [is] preempted by the National Traffic & Motor Vehicle Safety Act found at 15 U.S.C. § 1381, et seq."

5. The Secretary of Transportation's general authority to promulgate safety standards under the Safety Act has been delegated to the Administrator of the National Highway Traffic Safety Administration. See Section 1.50(a), Title 49, C.F.R.

motor vehicle performance, or motor vehicle equipment performance, which [are] practicable, which [meet] the need for motor vehicle safety and which [provide] objective criteria." Former Section 1391(2).

{¶ 11} In accordance with the Safety Act, Section 571.208, Title 49, C.F.R. ("standard 208" or "208") was promulgated[6] "to reduce the number of deaths of vehicle occupants, and the severity of injuries, by specifying vehicle crashworthiness requirements in terms of forces and accelerations measured on anthropomorphic dummies in test crashes, and by specifying equipment requirements for active and passive restraint systems." Section 571.208.S2. Standard 208 sets forth occupant restraint system options available to manufacturers. With respect to the vehicle at issue here, appellant does not allege that the 1990 Accord failed to meet the requirements of standard 208. Rather, appellant's products liability claim, grounded upon the theory of strict liability in tort, turns on a showing that Honda could have used an allegedly safer shoulder belt restraint system in its 1990 Accords and that Honda could have made its 1990 models safer by equipping them with air bags. Appellant's claim also rests on the grounds that, by changing the belt geometry in 1990 models and by installing air bags in 1992 Accords, Honda undertook remedial measures to correct the defective conditions that existed with respect to 1990 Accords.

{¶ 12} The Safety Act includes two sections that are particularly relevant to our determination of whether the court of appeals erred in determining that appellant was properly precluded from presenting evidence of the subsequent measures taken by Honda with respect to its Accords. The Act contains a preemption clause, which provided:

---

6. For an excellent and thorough historical analysis of Section 571.208, Title 49, C.F.R., see Chadwell, Automobile Passive Restraint Claims Post-Cipollone: An End to the Federal Preemption Defense (1994), 46 Baylor L.Rev. 141, 143-150.

"Whenever a Federal motor vehicle safety standard established under this title is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment *any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard*. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard." (Emphasis added.) Former Section 1392(d), Title 15, U.S.Code (now found, substantively unchanged, at Section 30103[b][1], Title 49, U.S.Code).

{¶ 13} As a specific exception to the preemption clause, the Safety Act also contains a savings clause. The savings clause stated that "[c]ompliance with any Federal motor vehicle safety standard *issued under this subchapter does not exempt any person from any liability under common law.*" (Emphasis added.) Former Section 1397(k), Title 15, U.S.Code (now found, substantively unchanged, at Section 30103[e], Title 49, U.S.Code).

{¶ 14} In the case at bar, the court of appeals determined that appellant was precluded under the Safety Act from presenting evidence of design changes made to the Accords. Thus, we must determine what effect both the preemption clause and the savings clause have on appellant's claim and, particularly, whether appellant should have been allowed to introduce evidence that the 1990 Accord did not have an air bag, that the belt geometry was changed in 1992 Accords, and that 1992 models contained air bags.

II

{¶ 15} The Supremacy Clause of the United States Constitution provides that "the Laws of the United States * * * shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Clause 2, Article VI, United States Constitution. Pursuant to the Supremacy Clause, Congress possesses the power to preempt state law. *Jenkins v. James B. Day & Co.* (1994), 69 Ohio St.3d 541, 544, 634 N.E.2d 998, 1001, citing *In re Miamisburg Train Derailment Litigation* (1994), 68 Ohio St.3d 255, 259, 626 N.E.2d 85, 89. In addition, "'[p]re-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation.'" *Id.* at 260, 626 N.E.2d at 89, quoting *Louisiana Pub. Serv. Comm. v. Fed. Communications Comm.* (1986), 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369, 382. See, also, *Carpenter v. Consol. Rail Corp.* (1994), 69 Ohio St.3d 259, 631 N.E.2d 607. In *English v. Gen. Elec. Co.* (1990), 496 U.S. 72, 78-79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 74, the United States Supreme Court described the three ways that state law can be preempted under the Supremacy Clause:

"First, Congress can define explicitly the extent to which its enactments pre-empt state law. See *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95-98 [103 S.Ct. 2890, 2898-2900, 77 L.Ed.2d 490, 500-502] (1983). Pre-emption fundamentally is a question of congressional intent, see *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299 [108 S.Ct. 1145, 1150, 99 L.Ed.2d 316, 325] (1988), and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.

"Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a 'scheme of federal regulation * * * so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress

'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459] (1947). Although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized: 'Where * * * the field which Congress is said to have pre-empted' includes areas that have 'been traditionally occupied by the States,' congressional intent to supersede state laws must be '"clear and manifest."' *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 614] (1977), quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S., at 230 [67 S.Ct. at 1152, 91 L.Ed. at 1459].

"Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, see, *e.g.*, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-143 [83 S.Ct. 1210, 1217-1218, 10 L.Ed.2d 248, 257] (1963), or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines v. Davidowitz*, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581, 587] (1941). See also *Maryland v. Louisiana*, 451 U.S. 725, 747 [101 S.Ct. 2114, 2129, 68 L.Ed.2d 576, 596] (1981)."

{¶ 16} More concisely, federal preemption of state law can occur in essentially three instances: (1) where Congress expressly preempts state law (express preemption); (2) where Congress has occupied the entire field (field preemption); or (3) where there is an actual conflict between federal and state law (conflict preemption). Field and conflict preemption are both forms of implied preemption. See *Gade v. Natl. Solid Wastes Mgt. Assn.* (1992), 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73, 90.

**{¶ 17}** The critical question in any preemption analysis is whether Congress intended state law to be superseded by federal law. *In re Miamisburg*, 68 Ohio St.3d at 260, 626 N.E.2d at 89, citing *Cipollone v. Liggett Group, Inc*. (1992), 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422. However, in considering issues arising under the Supremacy Clause, courts must start with the assumption that the historic police powers of the states are not to be superseded by federal law unless that is the clear and manifest purpose of Congress. *Id.* at 516, 112 S.Ct. at 2617, 120 L.Ed.2d at 422, citing *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152, 91 L.Ed. at 1459. See, also, *California Fed. S. & L. Assn. v. Guerra* (1987), 479 U.S. 272, 280-281, 107 S.Ct. 683, 689, 93 L.Ed.2d 613, 623; *CSX Transp., Inc. v. Easterwood* (1993), 507 U.S. 658, 663-664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387, 396 ("In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption."); and *Medtronic, Inc*. v. *Lohr* (1996), 518 U.S. ___, ___, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700, 715 ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action."). To that end, "[t]he applicable preemption provision must be read narrowly 'in light of the presumption against pre-emption of state police power regulations.'" *In re Miamisburg*, 68 Ohio St.3d at 264, 626 N.E.2d at 92, citing *Cipollone*, 505 U.S. at 518, 112 S.Ct. at 2618, 120 L.Ed.2d at 424.

A

**{¶ 18}** The court of appeals held, and we agree, that the Safety Act did not *expressly* preempt appellant's products liability claim based upon Honda's failure to install air bags in its 1990 Accords. The conclusion reached by the court of appeals is in accord with the vast majority of federal circuit courts that have considered a similar claim. See *Wood v. Gen. Motors Corp*. (C.A.1, 1988), 865 F.2d 395, 402; *Kitts v. Gen. Motors Corp*. (C.A.10, 1989), 875 F.2d 787; *Taylor v.*

*Gen. Motors Corp.* (C.A.11, 1989), 875 F.2d 816, 825; and *Pokorny v. Ford Motor Co.* (C.A.3, 1990), 902 F.2d 1116, 1121. But, cf., *Harris v. Ford Motor Co.* (C.A.9, 1997), 110 F.3d 1410, 1415 (concluding that Section 1392[d] expressly preempts state law causes of action for failure to install air bags). Further, various state Supreme Courts have also determined that the Act does not *expressly* preempt state damage claims based upon a manufacturer's failure to install air bags. See, *e.g.*, *Tebbetts v. Ford Motor Co.* (1995), 140 N.H. 203, 665 A.2d 345; *Wilson v. Pleasant* (Ind.1995), 660 N.E.2d 327; and *Munroe v. Galati* (Ariz.1997), 938 P.2d 1114.

{¶ 19} In the preemption clause, Congress expressed its intent to preempt all "safety standards" by a "State or political subdivision of a State" that are applicable to the same aspect of performance or item of equipment as the federal standard but "not identical to the Federal standard." See former Section 1392(d), Title 15. Honda contends that appellant's air bag claim falls squarely within the scope of this clause. Honda urges that appellant's air bag claim amounts to a state safety "standard" because appellant's claim "requires manufacturers to install airbags, not seat belts, in all vehicles." Therefore, according to Honda, appellant's "purported standard is not 'identical' to the federal standard, and federal law expressly preempts it."

{¶ 20} This court has recognized that, in the appropriate case, state tort claims can be within the preemptive reach of a federal statute. *Jenkins*, 69 Ohio St.3d at 544, 634 N.E.2d at 1001, citing *In re Miamisburg,* 68 Ohio St.3d at 262, 626 N.E.2d at 91. See, also, *Cipollone*, 505 U.S. at 520-523, 112 S.Ct. at 2619-2621, 120 L.Ed.2d at 425-427 (holding that the phrase "requirement[s] or prohibition[s] * * * imposed under State law" in Section 5[b] of the Public Health Cigarette Smoking Act of 1969, codified at Section 1334[b], Title 15, U.S.Code, is not limited to positive enactments by legislatures and agencies but may also include certain state law damage actions); and *Easterwood*, 507 U.S. at 664, 113 S.Ct. at 1737, 123 L.Ed.2d at 396-397 (finding that "[l]egal duties imposed on railroads by

the common law fall within the scope of" Section 434, Title 45, U.S.Code preempting any state "law, rule, regulation, order, or standard relating to railroad safety"). However, we do not agree with Honda's interpretation of the preemption clause. We believe that the domain expressly preempted by former Section 1392(d) does not include appellant's air bag claim. See *Cipollone*, 505 U.S. at 517, 112 S.Ct. at 2618, 120 L.Ed.2d at 423, and *Medtronic,* 518 U.S. at ___, 116 S.Ct. at 2250, 135 L.Ed.2d at 715. Indeed, given the presumption against preemption, and the fact that the preemption clause must be construed narrowly in light of that presumption, there is no basis for concluding that Congress intended former Section 1392(d) to preempt appellant's claim.

{¶ 21} Notably, former Section 1392(d) "does not expressly mention actions at common law or jury verdicts reduced to judgments by the courts." Chadwell, Automobile Passive Restraint Claims Post-Cipollone: An End to the Federal Preemption Defense (1994), 46 Baylor L.Rev. 141, 156. If Congress had intended in that clause to preclude state tort claims, it could have easily achieved this result. See *Medtronic,* 518 U.S. at ___, 116 S.Ct. at 2251, 135 L.Ed.2d at 717 ("[I]f Congress intended to preclude all common-law causes of action, it chose a singularly odd word ['requirement'] with which to do it. The statute [Section 360k(a), Title 21, U.S.Code] would have achieved an identical result, for instance, if it had precluded any 'remedy' under state law relating to medical devices."). See, also, *Taylor*, 875 F.2d at 824 ("An additional factor militating against a finding that the language of the Safety Act expressly preempts appellants' claims is that Congress did not make explicit reference to state common law in the Act's preemption clause as it has in the preemption clauses of many other statutes. Congress has long demonstrated an aptitude for expressly barring common law actions when it so desires.").

{¶ 22} Thus, we find that the absence of any explicit reference to state tort damage actions in the Safety Act's preemption clause leads to a finding that

appellant's claim is not expressly preempted under the Act.[7]  We agree with one commentator who has concluded that "[t]here is no indication that Congress considered a common law damages action to fall within the meaning of the term 'safety standard' as used in the Safety Act's preemption provision.  On its face, the preemption provision by its own terms merely appears to preclude state legislatures and other state rule-making bodies from mandating vehicle equipment or performance standards not identical to promulgated federal safety standards.

{¶ 23} "Beyond the precise words of the preemption provision, this reading is appropriate for several other reasons.  First, as dictated by *Cipollone*, one must construe express preemption provisions in light of the presumption against the preemption of state police power.  This presumption reinforces the necessity of a narrow reading of §1392(d).  Second, the preemption provision allows States and their political subdivisions to establish identical safety standards, and even higher standards when acquiring vehicles for their own use.  Third, there is no general, inherent conflict between federal preemption of state mandated vehicle safety standards and the continued vitality of state common law damages actions.  All of these considerations indicate that §1392(d) is best read as having superseded only positive enactments by state legislatures or administrative agencies that mandate particular safety standards with respect to vehicle performance."  (Footnotes omitted.)  Chadwell, *supra*, 46 Baylor L.Rev. at 176-177.

{¶ 24} Accordingly, permitting a state tort law cause of action does not, in and of itself, constitute the setting of a "standard" as contemplated in the Safety

---

7. An additional reason for rejecting Honda's express-preemption argument is that Congress did not add any reference to state tort claims in the preemption clause when it recodified and amended the Safety Act in 1994.  See 30103(b)(1), Title 49, U.S.Code, effective July 5, 1994, which provides that "[w]hen a motor vehicle safety standard is in effect under this chapter, a State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter."  By 1994, federal preemption of state law claims with respect to air bags was not a novel matter.

Act. Allowing a state cause of action does not set a standard requiring that Honda must include air bags in every vehicle it manufactures and sells.

{¶ 25} Moreover, even if we were to assume that the preemptive language of former Section 1392(d) is far-reaching enough to encompass state tort damage actions, the savings clause nevertheless expressly preserves such claims. See *Wilson*, *supra,* 660 N.E.2d 327 (holding that Section 1397[k] should be read to preserve state law claims). See, also, *Cipollone*, 505 U.S. at 518, 112 S.Ct. at 2618, 120 L.Ed.2d at 424 (noting that a savings clause in the Comprehensive Smokeless Tobacco Health Education Act of 1986 [Section 4406, Title 15, U.S.Code] "preserved state-law damages actions based on those products").

{¶ 26} Congress unambiguously expressed its intent in the savings clause not to exempt any person from "*any* liability under common law." (Emphasis added.) Former Section 1397(k), Title 15. Honda's express-preemption arguments, however, undercut the clear meaning of this language. In this regard, Honda's construction of the Safety Act contravenes the long-standing principle that a court must, if possible, give effect to every clause and word of a statute. See *United States v. Menasche* (1955), 348 U.S. 528, 538-539, 75 S.Ct. 513, 520, 99 L.Ed. 615, 624. Additionally, an examination of the history of the Safety Act supports our rejection of Honda's express preemption arguments. The Act's legislative history confirms that the savings clause was intended by Congress to preserve state law remedies for injuries occurring as a result of defective automobiles. Accord *Tebbetts,* 140 N.H. at 207, 665 A.2d at 347-348; *Wilson,* 660 N.E.2d at 338; *Munroe,* 938 P.2d at 1117-1118. See, also, *Hernandez-Gomez v. Leonardo* (1996), 185 Ariz. 509, 513, 917 P.2d 238, 242.

{¶ 27} Specifically, the Senate Report states that the "[f]ederal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law." S.Rep. No. 1301, 89th Cong., 2d

Sess. 12, reprinted in 1966 U.S.Code Cong. & Adm.News 2709, 2720. The House Committee Report also provides that Congress "intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contract, and *tort* liability." (Emphasis added.) H.R.Rep. 1776, 89th Cong., 2d Sess. 24 (1966). Remarks by members of Congress also support the view that, notwithstanding the preemption clause, the savings clause was intended to preserve all state tort damage actions. See, *e.g.*, 112 Cong.Rec. 20599 (1966) (remark by Senator Magnuson that "[t]he Senate conferees accepted the House provision that compliance with Federal standards does not exempt any person from common law liability. This provision makes explicit, in the bill, a principle developed in the Senate report. This provision does not prevent any person from introducing in a lawsuit evidence of compliance or noncompliance with Federal standards. No court rules of evidence are intended to be altered by this provision."). Indeed, nowhere in the Safety Act's history have we uncovered even the slightest hint that the preemption clause was intended to foreclose any state common-law duties enforced by damage actions.

{¶ 28} Accordingly, we conclude that the Safety Act should not be construed as manifesting an intent by Congress to preempt appellant's air bag claim. Therefore, we hold that appellant's claim is not expressly preempted by the Act.

B

**{¶ 29}** Having concluded that the language of the Safety Act does not expressly preempt appellant's claim, we turn next to the issue of implied preemption. Honda argues that even if the preemption clause in the Act does not expressly extinguish appellant's claim, it impliedly does so. In support of its position, Honda cites numerous courts that have concluded that the Safety Act impliedly preempts claims like the one asserted by appellant. See, *e.g*., *Wood*, 865 F.2d 395, and *Pokorny*, 902 F.2d 1116. We acknowledge that the clear weight of authority, at least before the court's decision in *Cipollone* and its progeny, supports Honda's position on this matter. See *Wilson*, 660 N.E.2d at 330.

**{¶ 30}** Appellant, on the other hand, urges that it is not necessary for us to consider whether Congressional intent to preempt a "no air bag" claim may be inferred under the principles of implied preemption. Appellant suggests that, in light of the court's findings in *Cipollone,* an implied preemption analysis is not required in this case.

**{¶ 31}** *Cipollone* involved state-law claims made by and on behalf of smoker and lung cancer victim Rose Cipollone against various cigarette manufacturers. As one of their defenses, the manufacturers in *Cipollone* asserted that the Federal Cigarette Labeling and Advertisement Act, enacted in 1965, and its successor, the Public Health Cigarette Smoking Act of 1969, Section 1331 *et seq.*, Title 15, U.S.Code, protected them from liability based on their conduct after 1965. The court in *Cipollone* determined that the preemptive scope of both the 1965 Act and the 1969 Act was governed entirely by the preemption clauses of each Act. In reaching this conclusion, the court observed:

"When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' *Malone v. White Motor Corp*. [1978], 435 U.S. [497], 505 [98 S.Ct.

1185, 1190, 55 L.Ed.2d 443, 451], 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation. *California Federal Savings & Loan Assn. v. Guerra*, 479 U.S. 272, 282 [107 S.Ct. 683, 690, 93 L.Ed.2d 613, 624] (1987) (opinion of Marshall, J.). Such reasoning is a variant of the familiar principle of *expressio unius est exclusio alterius*: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted. In this case, the other provisions of the 1965 and 1969 Acts offer no cause to look beyond § 5 of each Act. Therefore, we need only identify the domain expressly pre-empted by each of those sections. As the 1965 and 1969 provisions differ substantially, we consider each in turn." *Cipollone*, 505 U.S. at 517, 112 S.Ct. at 2618, 120 L.Ed.2d at 423.

{¶ 32} Relying on *Cipollone*, we have concluded that if the federal legislation at issue contains an express preemption clause, there is no need to look beyond the text of that clause to determine the preemptive intent of Congress. See, *e.g*., *In re Miamisburg*, 68 Ohio St.3d at 260, 626 N.E.2d at 90. See, also, *Jenkins*, 69 Ohio St.3d at 545, 634 N.E.2d at 1001 ("If a federal statute contains an express preemption clause, matters beyond the reach of the express clause are not preempted. * * * Since the FHSA [Federal Hazardous Substances Act, Section 1261 *et seq.*, Title 15, U.S.Code] contains a preemption clause, we examine the text of that clause to determine if Congress intended for appellee's claims to be preempted in the context of the FHSA.").

{¶ 33} However, following *Cipollone*, and subsequent to our decisions in *In re Miamisburg* and its progeny, the United States Supreme Court decided *Freightliner Corp. v. Myrick* (1995), 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385. In *Myrick*, the Supreme Court noted that an explicit statement limiting Congress's preemptive intent does not always obviate the need to consider the implied preemption. Specifically, the majority in *Myrick* concluded that:

"The fact that an express definition of the pre-emptive reach of a statute 'implies'—*i.e.*, supports a reasonable inference—that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption. Indeed, just two paragraphs after the quoted passage in *Cipollone*, we engaged in a conflict pre-emption analysis of the Federal Cigarette Labeling and Advertising Act, 79 Stat. 282, as amended, 15 U.S.C. § 1331 *et seq.*, and found 'no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common-law damages actions.' 505 U.S., at 518 [112 S.Ct. at 2618, 120 L.Ed.2d at 424]. Our subsequent decisions have not read *Cipollone* to obviate the need for analysis of an individual statute's pre-emptive effects. See, *e.g.*, *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 673 [113 S.Ct. 1732, 1742, 123 L.Ed.2d 387, 402], n. 12 (1993). ('We reject petitioner's claim of implied "conflict" pre-emption * * * on the basis of the preceding analysis'). At best, *Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." *Myrick*, 514 U.S. at 288-289, 115 S.Ct. at 1488, 131 L.Ed.2d at 393.

{¶ 34} Notably, *Myrick* did not overrule *Cipollone*. Rather, it is apparent that *Myrick* sought merely to disapprove of decisions interpreting *Cipollone* to mean that implied preemption can never exist when Congress has included an express preemption clause in the legislation in question. *Wilson*, 660 N.E.2d at 334.

{¶ 35} Thus, given the fact that *Myrick* did not overrule *Cipollone*, and applying the principles set forth in *Cipollone*, we agree with appellant that an implied preemption analysis is not required in this case. See *Wilson*, 660 N.E.2d at 334; *Tebbetts*, 140 N.H. at 207, 665 A.2d at 348; *Munroe,* 938 P.2d at 1117; and *Nelson v. Ford Motor Co*. (1995), 108 Ohio App.3d 158, 162, 670 N.E.2d 307, 310 ("The express preemption clause, when read together with the savings clause, provides a 'reliable indicium of congressional intent' to preserve common-law

causes of action such as appellant's."). However, given the findings in *Myrick*, we cannot tell whether the Supreme Court would necessarily agree that an implied preemption analysis is not warranted here.[8] *Myrick* stands for the proposition that an implied preemption analysis may be required even where there is an express preemption clause. Unfortunately, *Myrick* provides little guidance with respect to when an implied preemption analysis is actually required. In this regard, we agree with those courts that have attempted to reconcile *Cipollone* and *Myrick* and have concluded, ultimately, that, given the unsettled state of the law in this area, it is better to "take the jurisprudentially safer course and proceed with an implied preemption analysis." *Hernandez-Gomez*, 185 Ariz. at 514, 917 P.2d at 243. See, also, *Wilson*, 660 N.E.2d at 336; and *Munroe*, 938 P.2d at 1117.

{¶ 36} As we noted earlier, implied preemption includes both "field" and "conflict" preemption. Therefore, we begin our analysis of implied preemption with "field" preemption.

1

{¶ 37} The area of implied field preemption requires little discussion in light of the fact that Honda has conceded that the Safety Act does not occupy the field exclusively with respect to appellant's claim. Honda has accepted the fact that "[t]he Safety Act also contains a general savings clause, which makes clear that Congress did not intend to occupy the entire field of automotive safety." We agree with Honda in this regard. Additionally, we would also point out that the

---

8. Our uncertainty whether an implied-preemption analysis is or is not warranted in this case is further compounded by the fact that, in *Freightliner Corp. v. Myrick* (1995), 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385, the court determined that it was unnecessary to consider the effects of former Section 1397(k), Title 15, U.S.Code with respect to the respondents' claims, because the applicable federal safety standard had been suspended by court order. The court noted that "[b]ecause no federal safety standard exists, we need not reach respondents' argument that the term 'standard' in 15 U.S.C. § 1392(d) pre-empts only state statutes and regulations, but not common law. We also need not address respondents' claim that the savings clause, § 1397(k), does not permit a manufacturer to use a federal safety standard to immunize itself from state common-law liability." *Id.*, 514 U.S. at 287, 115 S.Ct. at 1487, 131 L.Ed.2d at 392, fn. 3.

preemption clause in the Safety Act specifically allows states to enforce identical standards and even higher standards for vehicles procured for their own use.

{¶ 38} Furthermore, it is also apparent that standard 208 does not create a "scheme of federal regulation [that] is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for" appellant's claim. *Guerra*, 479 U.S. at 281, 107 S.Ct. at 689, 93 L.Ed.2d at 623. The phrase "motor vehicle safety standards," as set forth in former Section 1392(a), Title 15, is defined as "*minimum* standard[s] for motor vehicle *performance*, or motor vehicle equipment *performance* * * *." (Emphasis added.) Former Section 1391(2). "Thus, from the beginning it is seen that the *minimum* standards were intended to apply to performance characteristics of the vehicle and equipment installed in the vehicle, not to what equipment must, or could be, installed." (Emphasis added.) *Hernandez-Gomez*, 185 Ariz. at 515, 917 P.2d at 244.

2

{¶ 39} We now move to "conflict" preemption. Honda urges that appellant's claim is impliedly preempted by federal law because appellant's claim actually conflicts with the federal scheme. Implied conflict preemption can occur in essentially two instances: (1) where it is impossible to comply with both state and federal requirements; or (2) where state law obstructs Congressional objectives. *Myrick*, 514 U.S. at 287, 115 S.Ct. at 1487, 131 L.Ed.2d at 392.

{¶ 40} After extensive analysis and reflection, we believe that many of Honda's arguments of implied conflict preemption rest on the same faulty premise as its express-preemption argument, namely, that appellant's claim somehow amounts to a state regulatory mechanism. That being the case, it is not "impossible" for Honda to comply with both federal and state law because, as we determined in Part IIA, *supra*, appellant's claim just does not amount to a state performance standard. Honda's arguments are not well taken for the additional reason that nothing within the Safety Act or standard 208 prevented Honda from including air

bags in its 1990 Accords to reduce injuries from head-on crashes. Honda chose to use an automatic belt as part of the passive restraint requirement. Honda could have installed a driver's-side air bag in the 1990 Accord. Indeed, such an installation was not "impossible." See *Wilson*, 660 N.E.2d at 337 ("We do acknowledge that in some cases, a common law judgment may be pre-empted due to a conflict with a federal law. However, we conclude that for there to be a conflict, state law— statutory, regulatory, or common—would have to mandate a passive restraint system *prohibited* by the federal regulation. Assuming, *arguendo*, that Indiana common law requires airbags, there would be no conflict with Rule 208 because Rule 208 does not prohibit airbags—it only permits some other alternatives."). (Emphasis *sic*.)

{¶ 41} Specifically, Honda contends, as part of its "conflict preemption" argument, that appellant's claim is impliedly preempted by the Safety Act because, if allowed, appellant's claim would frustrate Congress's goal of ensuring uniformity of automotive safety regulations. See *Wood*, 865 F.2d at 412 ("Congress decided that once the federal government had promulgated a standard, the states' usual role in setting safety standards was subordinated in the interest of national uniformity."); and *Harris*, 110 F.3d at 1415 ("The text of [Section] 1392[d] and its purpose in the overall structure of the Act—ensuring national uniformity in safety standards—clearly pre-empts common law claims.").

{¶ 42} We do not agree. Rather, we agree with those courts that have soundly rejected the position that uniformity is an overriding purpose of the Safety Act. See, *e.g.*, *Garrett* v. *Ford Motor Co*. (D.Md.1987), 684 F.Supp. 407, 409 ("The expressly declared purpose of the Act was to reduce deaths and injuries resulting from traffic accidents, 15 U.S.C. § 1381. Ford contends that Congress' purpose for the Act was to create uniformity in safety standards. While this was one of Congress' incidental concerns, it was not the primary one. Congress intended the Act to save the lives of automobile passengers through safety

standards[,] not the dollars of automobile manufacturers through uniformity."); and *Pokorny*, 902 F.2d at 1122 ("[U]niformity was not Congress's primary goal in enacting the Safety Act. * * * [W]e are unwilling to accept an overly broad notion of pre-emption based on uniformity that could have the effect of undercutting Congress's concern for safety."). See, also, *Wilson*, 660 N.E.2d at 338.

**{¶ 43}** While we are aware that Congress was concerned with providing uniform safety standards while enacting the Safety Act, see S.Rep. No. 1301, 89th Cong., 2d Sess. 12, reprinted in 1966 U.S.Code Cong. & Adm.News 2709, 2720,[9] the declared purpose of the Safety Act was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." Former Section 1381, Title 15. See, also, Section 571.208.S2, Title 49, C.F.R. ("The purpose of this standard is to reduce the number of deaths of vehicle occupants, and the severity of injuries * * *."). Indeed, "[n]ational uniformity of motor vehicle safety standards is at most an ancillary goal, subordinate to the primary goal of improved motor vehicle safety." *Harris*, 110 F.3d at 1417 (Van Sickle, J., dissenting).

**{¶ 44}** Honda also contends that appellant's claim would "conflict with and undermine" the purposes of the Safety Act and standard 208 because it would remove the flexibility and options authorized by federal law. See *Baird v. Gen. Motors Corp.* (N.D.Ohio 1986), 654 F.Supp. 28, 32 ("An automobile manufacturer

---

9. "The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country. At the same time, the committee believes that the States should be free to adopt standards identical to the Federal standards, which apply only to the first sale of a new vehicle, so that the States may play a significant role in the vehicle safety field by applying and enforcing standards over the life of the car. Accordingly, State standards are preempted only if they differ from Federal standards applicable to the particular aspect of the vehicle or item of vehicle equipment (sec. 104).

"The States are also permitted to set more stringent requirements for purposes of their own procurement. *Moreover, the Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law*." (Emphasis added.) S.Rep. No. 1301, 89th Cong., 2d Sess. 12, reprinted in 1966 U.S.Code Cong. & Adm.News 2709, 2720.

faced with the prospect of choosing the air bag option, or facing potential exposure to compensatory and punitive damages for failing to do so, has but one realistic choice. A court decision that removes the element of choice authorized in the occupant crash safety regulations will frustrate the statutory scheme."). See, also, *Pokorny*, 902 F.2d at 1123; and *Taylor*, 875 F.2d at 827.

**{¶ 45}** Again, we respectfully disagree. Like the uniformity element, assuring flexibility and choice was not the primary purpose of the Safety Act. The focus of the Act is to reduce deaths and injuries from automobile accidents by requiring safer vehicle designs.[10] Clearly, imposing liability for failure to install an air bag would not defeat the purpose of reducing deaths and injuries due to front-end crashes. Rather, the effect of liability here would be to compensate a plaintiff for the injuries allegedly caused by a manufacturer's choice not to do something which, in fact, was specifically allowed under federal law in the first instance. Moreover, we fail to see how appellant's claim could possibly remove the elements of flexibility and choice afforded under standard 208, because appellant's claim simply does not force Honda to do anything. Granted, an award of damages subjects a manufacturer to monetary liability, but that liability does not impose a legal obligation on the manufacturer to change its product design. *Hernandez-Gomez*, 185 Ariz. at 519, 917 P.2d at 248 ("Imposition of tort liability under Plaintiff's theory does not interfere with Congress' chosen method because it does not establish any performance standard. Standard 208 sets out minimum safety standards that are uniformly applicable to all cars manufactured, whereas tort liability operates to encourage behavior but not require it. Manufacturers may

---

10. We also note that the declared purpose of the present version of the Safety Act "is to reduce traffic accidents and deaths and injuries resulting from traffic accidents." Section 30101, Title 49, U.S.Code. Indeed, this section does not list uniformity or flexibility as additional purposes of the Safety Act.

weigh the risks and benefits and choose to live with the occasional lawsuit rather than change their behavior.").

{¶ 46} Accordingly, we find Honda's implied-preemption arguments not well taken. Congress did not intend for the Safety Act to occupy the entire field of auto safety. In addition, appellant's claim does not prevent compliance with standard 208, nor does it thwart the accomplishment of the full purposes of Congress. *Myrick*, 514 U.S. at 287, 115 S.Ct. at 1487, 131 L.Ed.2d at 392.

III

{¶ 47} Honda also contends that appellant's "no air bag" claim should be barred because during discovery, counsel for appellant stated that he would not raise the issue that the 1990 Accord did not contain an air bag. Apparently, this discussion occurred between the parties' attorneys during the deposition testimony of one of appellant's expert witnesses. Although Honda set forth portions of the deposition in its motion *in limine,* the deposition itself was apparently never filed with the trial court. Thus, we are unable to verify what actually occurred during the deposition. In any event, we find that appellant did not waive her right to bring this claim. Honda was aware that appellant would attempt to introduce evidence at trial of remedial changes made to Honda's 1992 Accords, which included the fact that 1992 models contained air bags. That is precisely why Honda filed its motion *in limine.* In addition, the trial court granted Honda's motion without a reason. Accordingly, from our review of what is now before us, we are compelled to find that Honda's argument is not well taken.

{¶ 48} In *McFarland v. Bruno Mach. Corp.* (1994), 68 Ohio St.3d 305, 626 N.E.2d 659, we held that "Evid.R. 407, which prohibits the introduction of evidence of subsequent remedial measures to prove negligence or culpable conduct, is not applicable to products liability cases premised upon strict liability in tort." *Id.*, syllabus. In *McFarland*, we set forth the pros and cons of allowing post-occurrence modifications by a manufacturer into evidence. In concluding that such evidence

was admissible in a products liability case premised upon strict liability in tort, we reasoned:

"[W]e are aware of the contention by some that the introduction of evidence of subsequent remedial measures in a strict products liability case could be highly prejudicial to a defendant-manufacturer. While this contention may have some validity, an equally plausible assertion can be made on behalf of an injured plaintiff if such evidence is excluded. Without question, all evidence going to the heart of an issue is, to some extent, 'prejudicial' to someone. That is the very essence of 'evidence' and our adversary system. Let the jury decide!" *Id.*, 68 Ohio St.3d at 312, 626 N.E.2d at 664.

{¶ 49} In the case at bar, Honda had the option to install air bags in its 1990 Accords but chose not to do so. However, Honda equipped its 1992 Accords with air bags. In addition, Honda changed the location of the shoulder belt attachment system in its 1992 models. Appellant was allowed to show the belt geometry makeup in a 1987 Honda *Civic* but was not permitted to show the location of the belt mechanism in 1992 Accords. According to appellant, both 1990 and 1992 Accords were the same body type. Hence, the question that remains in our minds is, why did Honda make these changes? Maybe the question answers itself. Clearly, evidence of the alleged remedial changes implemented by Honda directly concerns whether alternative designs were feasible and whether the 1990 Accord was in fact defective. Proof that Honda equipped its 1992 Accords with air bags and that the shoulder belts in 1992 models were positioned differently than 1990 Accords would be probative of the quality of 1990 Accords. The jury was not allowed to view these subsequent changes. "Let the jury decide!" *McFarland*, 68 Ohio St.3d at 312, 626 N.E.2d at 664.

IV

{¶ 50} In conclusion, we hold that a state tort claim based upon a manufacturer's failure to equip its automobiles with air bags is not expressly or

impliedly preempted by former Section 1381 *et seq.*, Title 15, U.S.Code and regulations promulgated thereunder. In accordance with *McFarland*, appellant should have been allowed to introduce evidence showing the subsequent design changes made by Honda to its 1992 Accords.

{¶ 51} Accordingly, we reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings not inconsistent with this opinion. On remand, the trial court should allow the parties to conduct additional discovery including, but not limited to, the subsequent changes made by Honda to its 1992 Accords.

*Judgment reversed*
*and cause remanded.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

_____

**COOK, J., dissenting.**

{¶ 52} Because I believe that state "no air bag" claims grounded in tort are impliedly preempted by the National Traffic and Motor Vehicle Safety Act, former Section 1381 *et seq.*, Title 15, U.S.Code ("Safety Act") and Federal Motor Vehicle Safety Standard 208, Section 571.208, Title 49, C.F.R. ("FMVSS 208"), I respectfully dissent.

{¶ 53} The majority bases its decision on the implied preemption issue on three factors: (1) appellant's state law cause of action does not amount to a state performance standard; (2) assuming that state law would penalize Honda for its failure to implement an air bag, it would not be "impossible" for Honda to comply with both state and federal law because the federal standard does not prohibit implementation of air bags; and (3) the primary purpose of the Safety Act is to reduce death and injuries resulting from traffic accidents, while national uniformity

in safety standards is a secondary goal. These factors, however, do not compel the majority's conclusion.

{¶ 54} It is important to an express-preemption analysis whether appellant's state law cause of action amounts to a state performance standard because, if it does not, express preemption cannot be found. That inquiry, however, has little bearing on the issue of implied preemption. In *Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407, the court stressed that state "'regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'" *Id.* at 521, 112 S.Ct. at 2620, 120 L.Ed.2d at 426, quoting *San Diego Bldg. Trades Council v. Garmon* (1959), 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775, 784. Accordingly, even if not the definitional equivalent of a safety standard, state actions at common law may generate tensions with federal safety standards so as to create a conflict, warranting preemption.

{¶ 55} In delimiting the reach of implied preemption, the United States Supreme Court has stated that "state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, * * * *or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'*" (Emphasis added.) *English v. Gen. Elec. Co.* (1990), 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 74, quoting *Hines v. Davidowitz* (1941), 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581, 587.

{¶ 56} I begin my analysis by noting that the rule set out by the Supreme Court on implied conflict preemption recognizes two disjunctive bases for preemption. The majority rejects preemption on the first basis, impossibility of compliance, determining that, by choosing air bags for all its automobiles, Honda

could comply with both state and federal law. The majority rejects the second basis for preemption, that allowance of "no air bag" claims stands as an obstacle to execution of the full purposes of Congress, by stating that Congress's primary purpose is reduction of traffic accidents, deaths and injuries—a goal that would be furthered by state law penalizing manufacturers for failure to implement air bags.

{¶ 57} The flaw in the majority's analysis rejecting the second, alternative basis for preemption is that the majority itself subverts a goal of Congress in passing the Safety Act—uniformity—in favor of what it labels the "overriding" purpose of the Act. *Cipollone*, however, establishes that a court is to look to the *full* purposes and objectives of Congress embodied in an act, not only to that purpose or objective that a court deems overriding.[11]

{¶ 58} In making law, a legislative body necessarily strikes balances in formulating a scheme to accomplish its ultimate goal. Compromises are necessary to reconcile legitimate competing interests and to ensure the act's workability. Piecemeal subversion of an act ultimately weakens it. In *Medtronic, Inc. v. Lohr* (1996), 518 U.S. ____, ____, 116 S.Ct. 2240, 2251, 135 L.Ed.2d 700, 716, the United States Supreme Court recognized that preemption analysis requires courts to look at the structure and purpose of the statute as a whole in determining Congress's purpose in enacting legislation. According to the court, that purpose is revealed "not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.*

---

11. Although the court in *Cipollone* primarily made its determinations of congressional intent for purposes of an express-preemption analysis, the court has noted the importance of congressional intent in any preemption analysis. In *English v. Gen. Elec. Co.* (1990), 496 U.S. 72, 79-80, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 75, fn. 5, the court noted: "By referring to these three categories [express preemption, implied field preemption, implied conflict preemption], we should not be taken to mean that they are rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation."

{¶ 59} Federal circuit courts considering this issue, before and after *Cipollone* was decided,[12] have determined that the Safety Act and regulations promulgated under it preempt state "no air bag" claims. See, *e.g.*, *Harris v. Ford Motor Co.* (C.A.9, 1997), 110 F.3d 1410 (express preemption); *Montag v. Honda Motor Co., Ltd.* (C.A.10, 1996), 75 F.3d 1414 (implied preemption); *Pokorny v. Ford Motor Co.* (C.A.3, 1990), 902 F.2d 1116 (implied preemption); *Taylor v. Gen. Motors Corp.* (C.A.11, 1989), 875 F.2d 816 (implied preemption); *Wood v. Gen. Motors Corp.* (C.A.1, 1988), 865 F.2d 395 (implied preemption). While a few state high courts have found against preemption, I believe that those courts, like today's majority, misunderstand the purpose of the Act's savings clause and have

---

12. The majority states its belief that given the express language of the savings and preemption clauses, an implied preemption analysis is not required in this case. Nevertheless, the majority states that it addresses the implied preemption issue out of caution. I believe that it is the clear import of United States Supreme Court law on supremacy of federal legislation, not mere caution, that mandates an implied-preemption analysis.

In *Cipollone*, the court determined that the preemptive scope of the legislation under consideration was governed entirely by the express language of the relevant preemption clauses. 505 U.S. at 517, 112 S.Ct. at 2618, 120 L.Ed.2d at 423. It is noteworthy, however, that the *Cipollone* court *first* determined that the other provisions of the relevant legislation offered no cause to look beyond the preemption clauses. *Id.* In fact, the court went on to analyze why implied conflict preemption did not apply, finding "no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common-law damages actions." 505 U.S. at 518, 112 S.Ct. at 2618, 120 L.Ed.2d at 424.

In *Freightliner* the court went to great lengths to dismiss as meritless the proposition that *Cipollone* obviates the need for implied conflict preemption analysis where an act includes an express preemption clause, stating that "[a]t best, *Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." 514 U.S. at 289, 115 S.Ct. at 1488, 131 L.Ed.2d at 393.

Finally, in *Medtronic, Inc. v. Lohr* (1996), 518 U.S. ___, 116 S.Ct. 2240, 135 L.Ed.2d 700, Justice Stevens, writing for a majority of the court, refused to go beyond the facts of that case and state that the express preemption clause under consideration foreclosed the possibility that any common-law actions would ever be preempted. In so doing, Justice Stevens noted that even upon consideration of future cases properly raising specific express preemption issues, "the issue may not need to be resolved if the claim would also be preempted under conflict preemption analysis." *Id.*, 518 U.S. at ___, 116 S.Ct. at 2259, 135 L.Ed.2d at 726.

The Supreme Court cases are not ambiguous. The existence of an express preemption clause does not excuse a court from determining whether implied preemption applies. While an express preemption clause may support an inference foreclosing *implied preemption*, it never forecloses *an implied-preemption analysis.*

failed to discern congressional intent from the structure and purpose of the Act as a whole. See *Munroe v. Galati* (Ariz.1997), 938 P.2d 1114; *Wilson v. Pleasant* (Ind.1995), 660 N.E.2d 327; *Tebbetts v. Ford Motor Co.* (1995), 140 N.H. 203, 665 A.2d 345.

## THE SAVINGS CLAUSE

{¶ 60} Former Section 1397(k) of the Act provided that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." Looking to the structure of the Act, it is noteworthy that the savings clause did not form a part of the clause devoted to preemption. Instead, the savings clause was remotely located, with four intervening sections separating it from the preemption clause. Additionally, the former preemption clause itself contained the exceptions to its reach. It permitted states to enforce safety standards identical to the federal standard and to require higher standards for motor vehicle equipment procured for its own use. Former Section 1397(d).

{¶ 61} What, then, was the purpose of former Section 1397(k)? I believe that the language used in that clause and its placement in the Act best support a conclusion that it was intended to eliminate compliance with federal regulations as a defense to unpreempted common-law actions. As noted by the Ninth Circuit Court of Appeals in *Harris,* "In the absence of former § 1397(k), manufacturers might claim that compliance with all Federal standards satisfies their common law tort duties as a matter of law, and that they should not be liable for a design or manufacturing defect even when no Federal standard exists." *Id.,* 110 F.3d at 1415-1416.

{¶ 62} "Exemption" from liability presumes that liability attaches in the first instance. Preemption does not provide an "exemption." Instead, it blocks application of laws so that liability cannot attach under the preempted law. See *Harris,* 110 F.3d at 1415. Had Congress intended to address preemption in the

savings clause, it easily could have spoken in terms of preemption rather than exemption, as it did in former Section 1392(d). Moreover, had Congress intended former Section 1397(k) to limit the preemptive reach of the Act, it could have placed the limiting language more appropriately in former Section 1392(d), alongside the preemption clause's express limitations. Compare *CSX Transp., Inc. v. Easterwood* (1993), 507 U.S. 658, 665, 113 S.Ct. 1732, 1738, 123 L.Ed.2d 387, 397 (noting that the structure of the Act under consideration "displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses.").

{¶ 63} Courts have consistently rejected the notion that savings clauses like former Section 1397(k) preserve "common law actions that would subvert a federal statutory or regulatory scheme." *Pokorny*, 902 F.2d at 1125, citing *Internatl. Paper Co. v. Ouellette* (1987), 479 U.S. 481, 492-494, 107 S.Ct. 805, 811-813, 93 L.Ed.2d 883, 897-898; see, also, *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.* (1981), 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258; *Pennsylvania RR. Co. v. Puritan Coal Mining Co.* (1915), 237 U.S. 121, 129-130, 35 S.Ct. 484, 487, 59 L.Ed. 867, 872; *Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co.* (1907), 204 U.S. 426, 446, 27 S.Ct. 350, 357-358, 51 L.Ed. 553, 561. On the other hand, if we interpret the savings clause as eliminating a defense to common-law actions outside the Act's preemptive reach, we preserve the overall consistency of the Act. Under former Section 1397(k), liability may still exist under common law for claims not in conflict with the Act's structure and purpose. For instance, in *Freightliner Corp. v. Myrick* (1995), 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385, the court allowed a state common-law action in tort premised on a "no antilock brake" claim because there was no conflicting federal safety standard in effect at the time. Additionally, former Section 1397(k) evinces a congressional intent to allow claims, such as the one tried below, alleging a manufacturing or design defect in a safety device sanctioned by the federal regulations. See *Perry v. Mercedes Benz of N. Am., Inc.*

(C.A.5, 1992), 957 F.2d 1257, 1265-1266 (state common-law action allowed for injury incurred when air bag failed to deploy).

NATIONAL UNIFORMITY IS A GOAL OF THE ACT REQUIRING
IMPLIED PREEMPTION OF STATE NO AIR BAG CLAIMS

{¶ 64} The majority concedes, as it must, that national uniformity of safety standards was a congressional goal in enacting the Safety Act. Nonetheless, the majority dismisses this goal as "ancillary" to Congress's "primary" and "overriding" goal of improved vehicle safety.

{¶ 65} There is no question that Congress enacted the Safety Act to improve vehicle safety. Both the language of the Act and the legislative history, however, demonstrate that Congress considered uniformity of safety standards an essential means to that end.

{¶ 66} As stated by the First Circuit Court of Appeals in *Wood*, 865 F.2d at 412, "[The] division of authority between state and federal government was part of Congress's chosen method for implementing the Safety Act. Congress believed that for the federal standards to be effective, they had to be uniform throughout the country. *See* 15 U.S.C. § 1392(d); Senate Report, 1966 U.S.Code Cong. & Admin.News at 2720 ('The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country.')." The text of the Act itself establishes this point, mandating that "no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard." Former Section 1392(d).

{¶ 67} Additionally, limited flexibility in choosing safety devices was a major objective of the Department of Transportation in promulgating FMVSS

208.[13]  This is best demonstrated by simply noting that the version of FMVSS 208 under consideration permits implementation of two alternative passenger restraint mechanisms.  49 Fed.Reg. 28962, 29009-29010 (July 17, 1984).  Providing such flexibility to manufacturers is consistent with the Safety Act, which delegates to the Secretary of Transportation the authority to establish federal motor vehicle safety standards that "*shall be practicable*, meet the need for motor vehicle safety, and be stated in objective terms."  (Emphasis added.)  Former Section 1392(a), Title 15, U.S.Code; see, also, *Pokorny*, 902 F.2d at 1125.

{¶ 68} Because uniformity and flexibility are necessary components to the continuing vitality of the Act, I would adopt the approach taken by the First Circuit in *Wood,* 865 F.2d at 402, and applied by the majority of federal circuit courts— that the Act and FMVSS 208 impliedly preempt state "no air bag" claims.  The ultimate reason for arriving at this conclusion was best stated by the *Wood* court in the following passage:  "[W]e are convinced that Congress's purposes, as revealed in the Safety Act and in the legislative history, plainly *imply* a preemptive intent. The instant product liability claim alleging that the absence of an air bag rendered the vehicle's design faulty would, if upheld, clearly 'stand as an obstacle' to the regulatory scheme of the Safety Act.  A state common law action sustaining the theory that a vehicle was defective because it lacked an air bag would, in effect, create a state safety standard related to the same aspect of performance of FMVSS 208 but not identical to FMVSS 208.  Such an action is, in our view, impliedly preempted because it would effectively circumvent section 1392(d)'s prohibition of nonidentical state standards covering the same aspect of performance as a federal safety standard.  Allowing a common law action holding manufacturers liable for failing to install air bags in motor vehicles would be tantamount to establishing a

13.  The Secretary has exercised his authority to promulgate safety standards by delegating that authority to the National Highway Traffic Safety Administration.  Sections 1.50 and 501.2, Title 49, C.F.R.

conflicting safety standard that necessarily encroaches upon the goal of uniformity specifically set forth by Congress in this area."

## EXCLUSION OF EVIDENCE REGARDING SEAT
## BELT DESIGN CHANGE IN 1992 ACCORD

{¶ 69} Initially, it is unimportant to the analysis that the trial court orally granted Honda's motion *in limine* to exclude evidence of implementation of air bags and subsequent design changes in the belt restraint system from model year 1990 Honda Accords to model year 1992 Accords and that there is no record to document the basis for that ruling. Reviewing courts must affirm the trial court's judgment if, upon review, any valid grounds are found to support that judgment. See *Joyce v. Gen. Motors Corp.* (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172, 174. "[A] reviewing court is not authorized to reverse a correct judgment merely because erroneous reasons were assigned as the basis thereof." *Id.; State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 222, 631 N.E.2d 150, 154.

{¶ 70} Aside from the rule on subsequent remedial measures (Evid.R. 407), the court was required to determine whether the evidence was relevant to the issues being tried (Evid.R. 402) and, if relevant, whether that evidence nonetheless should be excluded on grounds of prejudice, confusion, or waste of time (Evid.R. 403). Evid.R. 104(A) establishes that admissibility questions such as Evid.R. 402 and 403 are for the court to decide. I believe that the trial court could have excluded the evidence solely on the basis of Evid.R. 403.

{¶ 71} Having properly determined that a claim premised on the absence of an air bag was preempted by federal law, the court was left to determine the relevance of a change in seat belt design that was inextricably tied to Honda's change of passive restraint mechanisms from automatic seat belts to air bags. Because of the Safety Act's preemptive effect, the only theory remaining for Minton was that the automatic shoulder belt used in 1990 Accords was defectively

designed. Excluding "no air bag" claims, it was irrelevant that air bags were available as an alternative.

**{¶ 72}** At trial, Minton introduced expert testimony that, had the 1990 Accord shoulder belt attachment been moved backwards by approximately seven inches, Minton's injuries could have been minimized. Minton later unsuccessfully attempted to introduce evidence that Honda designed its 1992 Accord shoulder belt attachment seven inches to the rear of its position in the 1990 Accord. As noted by the appellate court, the seat belt restraints of the 1990 and 1992 Accord were not truly comparable. The 1990 version was an automatic passive restraint mechanism, while the 1992 version was a manual belt, with an air bag acting as the passive restraint. Nevertheless, evidence of Honda's placement of the shoulder belt attachment in 1992 Accords is arguably relevant to demonstrate Honda's design change in the shoulder belt attachment geometry. Moreover, under the authority of *McFarland v. Bruno Mach. Corp.* (1994), 68 Ohio St.3d 305, 626 N.E.2d 659, Evid.R. 407 does not prohibit introduction of evidence of the later change.

**{¶ 73}** As a second step in determining whether the evidence should be admitted, however, the court was required to apply Evid.R. 403(A):

"Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

**{¶ 74}** Having noted the limited relevance of the design change, I believe that the appellate court noted proper reasons why Evid.R. 403 mandated exclusion of the change in the 1992 Accord's shoulder belt attachment:

"In our opinion, * * * the difference in the two systems [automatic shoulder belt versus manual belt with air bag] would necessarily precipitate the introduction of evidence regarding the change from a passive shoulder belt to a manually operated shoulder belt, and thus would require the introduction of evidence regarding the reason for the design change (i.e., the conversion to airbag

technology, which was a federally mandated option). * * * [W]e find that evidence of the subsequent remedial change in the shoulder belt restraint system is inadmissible because it would inevitably lead to the jury's becoming aware of the fact that Honda switched to an airbag passive restraint system, thereby injecting an issue—the failure to have used the airbag system in the 1990 model Accord—that was preempted by federal law.

"We note that Minton was permitted to introduce expert testimony regarding the alleged design defect in the 1990 seat belt system, including, specifically, evidence regarding typical shoulder belt attachments in comparable systems of other automobile manufacturers. Therefore, we conclude that the trial court reasonably exercised the discretion inherent in its power to rule upon the admissibility of evidence to prevent the interjection of the omitted airbag theory of design defect, while not unduly restricting Minton's ability to show, through her use of evidence of comparable shoulder belt passive restraint systems in cars manufactured by Honda's competitors, that it was feasible to have designed the system with an attachment point closer to the driver's shoulder."

{¶ 75} In addition to the opportunity to demonstrate feasible alternative designs of comparable passive shoulder belt attachments, Minton also was permitted to introduce expert testimony that the upper attachment point of the manual belt on an earlier model Honda Civic provided a safer design than the attachment point for the automatic shoulder belt on the 1990 Accord.

{¶ 76} Accordingly, whatever slight probative value may attach to the difference in shoulder belt attachment points between the 1990 and 1992 model Honda Accords was substantially outweighed by that evidence's danger of unfair prejudice, confusion of issues, and misleading of the jury. Exclusion, therefore, was proper.

## CONCLUSION

**{¶ 77}** In light of the foregoing analysis, I would affirm the judgment of the court of appeals.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

_____