[Cite as *State v. Hoffman*, 2013-Ohio-4111.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO.  13-12-54

    v.

AARON D. HOFFMAN,                  O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 12-CR-0060

**Judgment Affirmed**

Date of Decision:   September 23, 2013

APPEARANCES:

    *Kent D. Nord*  for Appellant

    *Derek W. DeVine and Heather N. Jans*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Aaron Hoffman, appeals the judgment of the Court of Common Pleas of Seneca County convicting him of sexual battery and unlawful sexual conduct with a minor and sentencing him to a 60-month prison term. On appeal, Hoffman argues that his conviction was against the manifest weight of the evidence. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On April 4, 2012, the Seneca County Grand Jury indicted Hoffman with sexual battery in violation of R.C. 2907.03(A)(5), (B), a felony of the third degree, and unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), (B)(3), also a felony of the third degree. The indictment arose from Hoffman's purported sexual relationship with A.G. from 2009 until 2011, during which time she was between 15 and 17 years old. The alleged relationship occurred while Hoffman lived with A.G. and her mother, Abby Hartsel.

{¶3} A jury trial was held from September 24, 2012 to September 27, 2012. At trial, the following relevant evidence was adduced.

{¶4} First, Officer Gary McClure of the Tiffin Police Department testified regarding his investigation of an incident on August 25, 2010 at Hoffman's residence. Officer McClure responded to a possible burglary at the residence which led him to make contact with Hoffman. The alleged perpetrator of the

burglary suggested that his motivation for his actions was Hoffman's purported sexual relationship with his daughter. Based on the nature of the perpetrator's allegations, the investigating officers delved into Hoffman's possible activities inside the house with A.G. According to Officer McClure, his initial contact with Hoffman about those activities proceeded as follows:

> Hoffman advised that he received back rubs from [A.G.] due to a back injury that he had received several years before this. He advised that he receives back rubs from [A.G.] there, two to three times a week. Normally, he is wearing just a pair of gym shorts. And when [A.G.] rubs a certain spot on his lower back, he does get aroused and ejaculates. Trial Tr., p. 159-60.

Despite these revelations, the investigation did not move beyond this initial contact. On cross-examination, the following exchange occurred:

> Q: Well, what – well, did it – you looked at the [police] report earlier today. Did it say in that report that [Hoffman] admitted ejaculating?
>
> A: I don't believe he admitted that [Hoffman] did, but [A.G.] and [Hartsel] –
>
> Q: Well, all right. Thank you. That's all the questions I have.

Trial Tr., p. 161-62.

{¶5} Tiffin Police Department dispatcher, Alexia Feasel, then testified regarding a telephone call received by the department on March 27, 2011. In that call, the boyfriend of A.G.'s brother reported A.G.'s allegation to him and her

brother that Hoffman was engaged in a sexual relationship with her. The boyfriend also indicated that A.G. alleged Hoffman threatened her.

**{¶6}** Tiffin Police Officer Jack DeMonte responded to the March 27, 2011 call from Hoffman's residence. He indicated that he made contact with Hoffman and that Hoffman denied A.G.'s allegations. According to Officer DeMonte, Hoffman "referred to [A.G.] as his daughter." Trial Tr., p. 173. Officer DeMonte said that A.G. left Hoffman's residence on March 27, 2011 to go live with her brother.

**{¶7}** Lieutenant Michelle Craig of the Tiffin Police Department was the next witness to testify. She discussed the execution of a search warrant at Hoffman's residence on March 31, 2011. Lieutenant Craig described Hoffman's behavior during the search as follows:

> Q: Did [Hoffman] make any other comments during the search warrant?
>
> A: Yes. He would contradict himself throughout. We found numerous VCR, VCR tapes of nudity. He says those were old. He doesn't even have a VCR. And we opened up the TV stand underneath the TV and there was a VCR. And I said, I thought you didn't have a VCR. Well, "that's dusty." I said, okay.
>     Ugh, I then asked him if [A.G.] ever slept in the back bedroom, in the main bedroom? And he said, nope, she never slept there.
>     And, I said, well, we will be taking samples for DNA comparison. And then he changed and said "well, she does sleep there, but when she does I sleep on the couch."

Trial Tr., p. 190. Lieutenant also testified that Hoffman denied the allegations:

> Q: Did [Hoffman] make any other comments with regards to this relationship with [A.G.]?
>
> A: He said he wouldn't touch her inappropriate [sic] because he was like a father to her. Uhm, every morning she kisses him on his cheek good morning and every night she kisses on his check for good-night.

Trial Tr., p. 190.

{¶8} As part of the search, Lieutenant Craig took DNA samples from Hoffman, Hartsel, and A.G. She indicated that Hoffman's residence had two bedrooms: (1) the back, master bedroom, which was described as Hoffman's and Hartsel's room; and (2) the front, single bedroom, which was described as A.G.'s room. Lieutenant Craig also said that a portion of the mattress from the back bedroom and several sex toys were taken from the residence for further testing. Additionally, she testified that the searching officers found several pornographic movies, magazines, and pictures in Hoffman's residence. In regard to the August 2010 investigation of Hoffman, Lieutenant Craig testified as follows:

> Q: What caused the case to be put on hold?
>
> A: Basically when we questioned [Hartsel] and [A.G.] about that and massages were, yes, that's what was happening. [Hartsel] said, yes, he did tell me he was ejaculating, but that later she was told it was just something [Hoffman] was using against her. And when he asked if there was any other sexual activity, [Hartsel] said, no.
>
> * * *

Q: Was there an explanation for why the information – that was coming out during this investigation was different from the investigation that occurred back in 2010?

A: Yes. I did ask [A.G.] why she lied to us. And she said that she was afraid. She said [Hoffman] gets out of everything. I thought he would get out of it and come after me or take things away from me or hit me, as he has in the past or – or hit me.

Trial Tr., p. 201-02.

{¶9} Lieutenant Craig also discussed A.G.'s receipt of text and electronic messages from a person claiming to be "Byron Smith." According to her investigation, the phone number "Smith" gave to A.G. was registered in Hoffman's name. This discovery led to the execution of another search warrant. In the second search, the police found text messages on Hoffman's phone and electronic messages on his computer between "Smith" and A.G. When asked about "Smith," Hoffman indicated that "Smith" was a person who lived in Bascom, Ohio. However, after further investigation, Lieutenant Craig was unable to find any "Byron Smith" who lived in the Bascom area.

{¶10} On cross-examination, Hoffman testified as follows regarding the contents of the messages between "Smith" and A.G.:

When we came across [the messages], at that time we already knew that Aaron Hoffman was purporting to be Byron Smith. And we wanted to know why he was contacting her in that way and what the purpose of that was. Which, once you read the notes you see that it's a controlling issue.
And that basically he's trying to persuade her saying, "His sister had the same incident. Regrets throwing her uncle in jail for

doing the same thing to her." Basically. Uhm, that "he must have really cared for her to promise these things for sexual favors." And, "shouldn't you have a serious talk?"

And also, uhm, a lot of things that were the same, "he'll go [to] the prison for life. Do you really wanna do that to him?" These kind[s] of statements are made in there.

Trial Tr., p. 221.

{¶11} Sergeant Jason Windsor of the Tiffin Police Department also testified regarding the investigation of the messages between "Smith" and A.G. As part of the investigation, he posed as A.G. during the exchange of messages. The following relevant exchange occurred:

Q: How did this ["Smith"] character appear when he was texting you as [A.G.]?

A: Uhm, he appeared very obsessed and controlling. Uhm, he would send texts six, seven, eight in a row. And if I didn't respond he was asking, where you at? What are you doing? At that time, I was on midnight shift so I come [sic] up with an excuse that I was babysitting in the day you can't text me. Because I go to sleep after I got home from work, I turned the phone off. When I woke up at two, three in the afternoon, there would be seven, eight texts in there waiting for me.

* * *

Q: Was there any indication from these text messages and communications that this ["Smith"] individual had any kind of interest in [A.G.]?

A: He appeared to wanna know what she was doing all the time. He appeared to be infatuated with her. Said, he would say that, you know, "I really like you. You mean the world to me," stuff like that.

Trial Tr., p. 295-96. According to Sergeant Windsor, Hoffman, posing as "Smith," did not try to get A.G. to stop pursuing the charges. Rather, Hoffman merely said that the case "could become a long drawn out thing." Trial Tr., p. 297.

{¶12} Freda Cardwell, one of Hoffman's neighbors, next testified that Hoffman lived in his residence with A.G. and Hartsel. She further stated that Hoffman called A.G. his daughter.

{¶13} A.G. was the primary witness regarding the alleged sexual relationship between her and Hoffman. She said that she was born in February 1994 to Hartsel and her father, Duane Gelhausen, who has several disabilities and lives in a nursing home. Starting in 2009, when she was 14 or 15 years old, A.G. started to live in Hoffman's residence with Hoffman and her mother. According to A.G., the sexual relationship started soon after moving in:

> Q: And once you moved into [Hoffman's residence], did anything sexual happen between you and [Hoffman]?
>
> A: Yes.
>
> Q: And do you remember approximately when this sexual activity started between you and [Hoffman]?
>
> A: Uhm, I believe it was around when I was 15, 15 ½.
>
> * * *

Q: * * * What kind of sexual activity started between you and [Hoffman] at that time you were living at [his residence]?

A: Uhm, it began with, uhm, hand ejaculations, uhm, moving to oral and anal and vaginal.

Q: Now, when you're talking about oral sex and such, who was performing what to who?

A: Uhm, both.

Q: And there was sexual intercourse between the two of you?

A: Yes.

Q: Did all of this start before you were 16?

A: Yes.

Trial Tr., p. 326-27.

{¶14} A.G. described her sexual activity with Hoffman in great detail:

Q: When you would perform oral sex on [Hoffman] did he ejaculate?

A: Yes.

Q: Did he use condoms at all?

A: Yes.

Q: Do you know what kind of condoms those were?

A: For which activity?

Q: Were there multiple condoms that were used?

A: Uhm, when oral was performed the taste of the semen was very disgusting so he had gotten flavored condoms. And eventually he

ended up using Jolly Ranchers instead, but for the intercourse he used Trojan Ecstasy.

Trial Tr., p. 330. A.G. also extensively described the tattoos and marking on Hoffman's body, including those on his hips.

{¶15} According to A.G., she had sexual relations with Hoffman two to three times a week. She said that they had sexual relations in the back bedroom, including during her menstrual cycle. During the course of the activities, the two used sex toys, including a back massager, a pink vibrator, and a purple "puff plug." Trial Tr., p. 332. A.G. said that both of them used the vibrator, with her using it on her vagina and Hoffman using it on his anus. In return for these sexual activities, A.G. testified that she received special privileges, such as later curfews, and that Hoffman promised to give her other items, such as a car.

{¶16} In regards to her relationship with Hoffman, A.G. testified as follows:

Q: From the time that you and your mom moved in with [Hoffman] to [his residence] until the time you left in March 2011, what was your relationship like with [Hoffman]?

A: Uhm, sometimes he treated me like a girlfriend and sometimes he treated me like a daughter.

Q: Did you have chores that you were required to do?

A: Yes.

Q: What kind of chores did you have in the house?

A:  Just dishes, laundry, keep the house clean, take care of the dog.

Q:  If you wanted permission to go somewhere, to go out with your friends or something, who did you have to ask permission of?

A:  [Hoffman].

* * *

Q:  Did you ever go out to dinner with [Hoffman] and [Hartsel]?

A:  Yes.

Q:  Do you know who would pay when you usually went out to dinner?

A:  [Hoffman].

Q:  Did [Hoffman] act similar to a father figure to you?

A:  Yes.

Trial Tr., p. 336-38. A.G. also discussed going on vacations with Hoffman, including a trip to a nudist camp.

{¶17} As to the previous August 2010 investigation, A.G. said that she lied to the police and denied a sexual relationship with Hoffman because she "was just terrified." Trial Tr., p. 341. She also indicated that she had not come forward earlier with her allegations because she "was scared." Trial Tr., p. 335.

{¶18} On cross-examination, Hoffman elicited testimony from A.G. regarding her irritation with Hartsel over the payment of her father's disability benefits:

Q: Because of your father's disability and ill-health, you, as a dependent, or your caretaker, were to receive dependency benefits through social security, correct?

A: Yes.

Q: You became aware of that, didn't you?

A: Uhm, when I was in my mother's care. I didn't see a dime of it.

Q: You became aware of it, didn't you?

A: Yes.

* * *

Q: She said – did you – it irritated you, didn't it, that you did not see as much as a dime of it?

A: A little.

Q: And it continued that way until late March of 2011, didn't it? Your mother was receiving the social security dependency money you represented?

A: Yes, mom got that money.

* * *

Q: * * * When, in late March of 2011 you left the care of your mother and you went to live with your brother * * * and his fiancé * * *, what became of your social security money?

A: It was given to my brother and his fiancé for financial means for providing for me.

Trial Tr., p. 346-48.  Although the money from the dependency benefits went to A.G.'s brother, she indicated that it was eventually deposited in her savings account to pay her college tuition.

{¶19} A.G. denied that Hartsel was responsible for the rules of the house or that Hartsel disciplined her.  She said that she had many disagreements and arguments with Hoffman over what she could and could not do.  This led to the following exchange:

> Q:  All right.  And you had a design in mind the month of March 2011 that you'd like to break from your mother and go live with [your brother], correct?
>
> A:  Yes.
>
> * * *
>
> Q:  You had to find a way out of [Hoffman's residence], didn't you, in March 2011?
>
> A:  Yes.
>
> Q:  And by telling [A.G.'s online boyfriend] and your brother that you had sexual conduct with [Hoffman], that was effected; that did happen, didn't it?
>
> A:  Yes, but all of the allegations were true.

Trial Tr., p. 357, 361.  A.G. identified two letters that she wrote around the time of the August 2010 investigation in which she denied having sexual relations with Hoffman.  She also admitted that she denied any sexual activity when talking with her high school friends.

{¶20} A.G. acknowledged that she used the sex toys found in Hoffman's residence. She said that Hoffman bought the sex toys for her. She also stated that she masturbated in the back bedroom.

{¶21} On redirect examination, A.G. said that she wanted to leave Hoffman's residence because she was "depressed," "miserable," "afraid," and "disgusted in [her]self." Trial Tr., p. 392. She said that Hoffman made her watch pornographic movies and look at pornographic magazines so that she could "learn new moves for him." Trial Tr., p. 393. A.G. further testified to her fear of Hoffman:

> Q: Now, you previously testified that you were afraid of coming forward with this sexual abuse information. Why were you afraid?
>
> A: I was afraid of what people would think of me. I was afraid for my safety. I was afraid where I was gonna go, what I was gonna do and I was just terrified.
>
> Q: With regard to your safety, what were you afraid of?
>
> A: Well, [Hoffman] owns numerous guns and ammunition. And I know he has a violent past.

Trial Tr., p. 393.

{¶22} The State's final witness was Casandra Agosti, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation. She performed chemical analyses of several items seized from Hoffman's residence. The chemical analysis of the towel that was found on top of the back massager in the

-14-

back bedroom revealed a "mixture with contribution from [A.G.] and [Hoffman]." Trial Tr., p. 420. According to Agosti, mixture "means that there actually essentially were two DNA profiles together on this item." Trial Tr., p. 420.

{¶23} The cutout from the back bedroom's mattress contained a mixture that "was consistent with [A.G.] and [Hoffman]." Trial Tr., p. 421. The red sexual device contained a mixture with A.G. the major profile at one point and Hoffman the major profile at the opposite point. The body massager was found to have a mixture with A.G. the major profile and Hoffman the minor profile. Agosti testified that she was able to eliminate Hartsel as a contributor to the mixture on the mattress, the red sexual device, and the body massager.

{¶24} In his defense, Hoffman called several character witnesses who testified to his general good character. One witness, Jade Carter, testified that A.G. does not have a reputation for truthfulness in the community. However, on cross-examination, Carter acknowledged that she was serving time for a "probation violation." Trial Tr., p. 541.

{¶25} Hoffman testified on his own behalf. In regard to the nudist camp vacation, Hoffman said that he was never naked in view of A.G. As to the August 2010 investigation of the back rubs A.G. gave to Hoffman, he testified as follows:

> I told them [the police] – how the story came about, I was mad at [Hartsel] for, you know, as you heard earlier, I was upset and I did a stupid thing and whispered in [Hartsel]'s ear. I said, you know, I come in my pants. I didn't think [A.G.] would hear. Well, she did.

And then, whew, from there on it just escalated like the old telephone game, you tell something and it just escalated into something I didn't even think it would even escalate. Yeah.

Trial Tr., p. 565-66. Hoffman denied actually ejaculating during the back rubs and ever being naked in A.G.'s presence. He also said that Hartsel was always present during the back rub and that she could not give them because she had diabetes, which affected her hands.

{¶26} Hoffman said that he never had legal custody of A.G. He further discussed the authority over A.G. as follows:

Q:   What, if any, authority gave you authority during that two year period of time over [A.G.]?

A:   Nobody gave me authority over her.

Q:   Who was exercising authority over [A.G.] that two year period of time?

A:   That would be, would be Abby Hartsel.

Trial Tr., p. 577. Additionally, the following relevant exchange occurred regarding Hoffman's role in disciplining A.G.

Q:   Well, okay, did you tack on any rules yourself?

A:   No.

Q:   Why not?

A:   It ain't my kid.

Q:   Well, you had the power over her, didn't you?

A:   No, I didn't.

Q:   You were telling her what to do, weren't you?

A:   No, sir.  [Hartsel] said that's my daughter, I'll take care of her.

Trial Tr., p. 589-90.

{¶27} Hoffman testified that A.G. was "infatuated" with the back bedroom and was constantly going in there.  Trial Tr., p. 578.  He also said that on March 26, 2011, he came home to find the bed in the back bedroom "all unmade and the massager on the towel was laying up on the nightstand."  Trial Tr., p. 592.  At that time, Hoffman said it seemed like another man was there with A.G., but he did not see the other man.

{¶28} As to the "Smith" character, Hoffman said that he was emulating "Dog the Bounty Hunter" and created the character as a means to elicit information from A.G.  The following exchange about this purported motivation occurred:

Q:   All right.  How did you go about it?

A:   To trying to be her friend so she would confide and so she would tell the truth that she was lying about all of this.  And, I don't know.  It didn't work out as well as it did on TV.

Trial Tr., p. 624-25.  Ultimately, Hoffman said he wanted to use "Smith" to get "the truth."  Trial Tr., p. 626.

{¶29} Hoffman denied ever having sexual relations with A.G. He also denied threatening her, asking her to lie to the police, and promising favors in exchange for sexual relations. Hoffman further denied watching or looking at the pornography found in the house. He indicated that he received the pornography after buying a box at a local flea market without first looking inside of it. Hoffman additionally said that the pornographic magazine found under his mattress was not his. According to his testimony, Hoffman suspected that one of A.G.'s acquaintances came into the residence and planted the magazine there.

{¶30} On cross-examination, Hoffman noted that there were inconsistencies between his testimony and his previous statements to police. For instance, he admitted that he told police officers that he ejaculated after A.G. rubbed his back. He also acknowledged telling police that "Smith" was a real person and lived in Bascom. On cross, Hoffman further discussed his role in A.G.'s life as follows:

Q: And you also told several people, you testified that you treated [A.G.] like your own daughter right?

A: I treat a lot of kids like that.

Q: That you – you took in her and [Hartsel], it was a whole package deal, right?

A: Yeah.

Q: Gave fatherly advice?

A:    I gave a lot of kids fatherly advice.

Q:    Took her places?

A:     I took [Hartsel] places a lot.  I take a lot of kids places.

Trial Tr., p. 635.  After Hoffman's testimony, he rested and the trial court charged the jury.

{¶31} On September 27, 2012, the jury returned guilty verdicts on both counts alleged in the indictment.  The trial court issued its judgment entry of sentencing on November 13, 2012, which imposed concurrent 60 month prison terms.[1]

{¶32} Hoffman filed this timely appeal, presenting the following assignment of error for our review.

### *Assignment of Error*

**THE CONVICTION IN THE TRIAL COURT SHOULD BE REVERSED BECAUSE IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND BECAUSE THE EVIDENCE SUPPORTING IT WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE THE CONVICTION BEYOND A REASONABLE DOUBT.**

{¶33} In his sole assignment of error, Hoffman argues that his conviction was against the manifest weight of the evidence.[2]  We disagree.

---

[1] The trial court's judgment entry states that there was a "finding of guilty by a trial to the Court."  (Docket No. 49, p. 1).  This statement was erroneous since the record plainly reflects that the trial court conducted a jury trial in this matter.

[2] Although the language of the assignment of error seems to challenge the sufficiency of the evidence as well as the manifest weight of the evidence, Hoffman's brief focuses exclusively on the manifest weight of the evidence.  As such, we view this appeal as not presenting a sufficiency challenge.

*Standard of Review*

**{¶34}** When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 83 (1997). Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1989). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id*. at paragraph three of the syllabus.

*R.C. 2907.03(A)(5)*

**{¶35}** Hoffman was convicted of sexual battery in violation of R.C. 2907.03(A)(5). This statute states that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." R.C. 2907.03(A)(5). "Sexual conduct" is defined as "vaginal intercourse between a male and a female; anal

intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, or other object into the vaginal or anal opening of another."  R.C. 2907.01(A).

{¶36} There is no definition in the Revised Code for "in loco parentis." However, the Supreme Court of Ohio has defined the phrase, for the purposes of R.C. 2907.03(A)(5), as "apply[ing] to a person who has assumed the dominant parental role and is relied upon by the child for support."  *State v. Noggle*, 67 Ohio St.3d 31 (1993), paragraph one of the syllabus, *superseded by statute on other grounds as stated in State v. Bajaj*, 7th Dist. Columbiana No. 03 CO 16, 2005-Ohio-2931.  In *Noggle*, the court further stated as follows: "A person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding. * * * Simply put, [R.C. 2907.03(A)(5)] applies to the people the child goes home to."  *Id*. at 33.  Based on these principles, "[t]he key factors of an in loco parentis relationship have been delineated as 'the intentional assumption of obligations incidental to the parental relationship, especially support and maintenance.'"  *Evans v. The Ohio State Univ.*, 112 Ohio App.3d 724, 736 (10th Dist. 1996), quoting *Nova Univ., Inc. v. Wagner*, 491 So.2d 116, fn. 2 (Fla.1986).

*R.C. 2907.04(A)*

**{¶37}** Hoffman was also convicted of violating R.C. 2907.04(A), which states that "[n]o person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard." The statute imposes criminal liability where the offender either knows the victim was between 13 and 16 years of age or is reckless as to the victim's age. Under R.C. 2901.22(B), a person is deemed to "have knowledge of circumstances when he is aware that such circumstances probably exist." As to recklessness, the Revised Code provides that "[a] person is reckless with respect to circumstances, when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C).

*Recapitulation of Relevant Evidence*

**{¶38}** This matter essentially presents a he-said/she-said situation with A.G. claiming a sexual relationship and Hoffman denying it. Despite the existence of conflicting testimony, we do not find that the evidence is so overwhelming as to render Hoffman's conviction a miscarriage of justice.

**{¶39}** A.G. testified extensively regarding the alleged sexual relationship between her and Hoffman. She indicated that the relationship started while she

-22-

was 15 years old, included anal, oral, and vaginal sex, and occurred while she lived in Hoffman's residence, where he treated her like a daughter. Also, according to testimony from investigating police officers, Hoffman admitted to them that he was a father figure for A.G. In light of this evidence, the elements of sexual battery and unlawful sexual contact with a minor are clearly satisfied.

{¶40} Additionally, the chemical analyses of the mattress from the back bedroom and the sex toys, which showed DNA profiles from both Hoffman and A.G., tend to corroborate A.G.'s testimony. Further, Hoffman's assumption of the "Byron Smith" character and his misleading of police about it markedly reduce his credibility and indicate a propensity for deception. Moreover, a reasonable juror could easily disregard some of the more far-fetched denials in Hoffman's testimony, such as his position that the pornographic magazine under his mattress was not his and his allegation that one of A.G.'s acquaintances planted it there.

*Hoffman's Arguments*

{¶41} Hoffman's position focuses on three items: (1) Officer McClure's purported lack of credibility; (2) Officer DeMonte's alleged lack of credibility; and (3) A.G.'s purported lack of credibility. None of these items are a sound basis for reversal of Hoffman's conviction.

{¶42} Hoffman identifies the following testimony from Officer McClure as indicating his lack of credibility: "Mr. Hoffman advised * * * [that] when [A.G.]

rubs a certain spot on his lower back, he does get aroused and he ejaculates." Trial Tr., p. 159-60. Hoffman argues in his brief that this testimony was categorically untrue. Hoffman's argument, however, has no basis since his own testimony confirms the veracity of Officer McClure's testimony:

> I told them [the police] – how the story came about, I was mad at [Hartsel] for, you know, as you heard earlier, I was upset and I did a stupid thing and whispered in [Hartsel]'s ear. I said, you know, I come in my pants. I didn't think [A.G.] would hear. Well, she did. And then, whew, from there on it just escalated like the old telephone game, you tell something and it just escalated into something I didn't even think it would even escalate. Yeah.

Trial Tr., p. 565-66. Based on Hoffman's own admission, we find little reason to disbelieve Officer McClure.

{¶43} According to Hoffman, Officer DeMonte's testimony is incredible because he stated that his August 2010 investigation stemmed from an allegation that Hoffman was engaged in a sexual relationship with another person's daughter. While there may be an evidentiary basis for this statement's exclusion, we are unable to find that this statement, by itself, renders Officer DeMonte's testimony incredible. Further, Officer DeMonte's testimony in comparison to the other evidence adduced at trial was minimal and relatively inconsequential.

{¶44} In regard to A.G.'s credibility, Hoffman argues that the evidence at trial manifestly shows that she had financial and personal motivations to concoct the allegations against him so she could get out of his residence. While there is

certainly evidence suggesting this, we do not believe that a reasonable juror had to conclude that those motivations produced A.G.'s allegations. Indeed, a reasonable juror could rely on the following testimony to find that A.G. came forward due to the emotional trauma she suffered from the purported sexual relationship between her and Hoffman:

> Q: Did you wanna leave the home?
>
> A: Yes. So desperately.
>
> Q: And why is that?
>
> A: I – I was depressed. I was miserable. I was afraid. I was – I felt disgusted in myself.

Trial Tr., p. 392. Hoffman also argues that the variance in A.G.'s version of events from the August 2010 investigation to the current matter render her testimony unbelievable. However, A.G. testified at length that she originally denied the sexual relationship with Hoffman because she was afraid of him.

{¶45} Hoffman finally argues that A.G. was incredible because the police did not find condoms in Hoffman's residence, which would tend to discredit her testimony that Hoffman used condoms during their sexual activities. However, this lack of evidence is not fatal to A.G.'s credibility. Further, A.G. also testified that Hoffman used Jolly Ranchers to disguise the taste of his semen and the police did find them in his bedroom.

**{¶46}** In sum, Hoffman's conviction was not against the manifest weight of the evidence.

**{¶47}** Accordingly, we overrule Hoffman's sole assignment of error.

**{¶48}** Having found no error prejudicial to Hoffman in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW. J.J., concur.**

**/jlr**